UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

SAMUEL MARTINEZ,

                      Plaintiff,

            -against-

CITY OF NEW YORK; JOHN HOLMES and
MICHAEL VECCHIONE, Individually and as
Employees of the Kings County District Attorney's
Office, DETECTIVE GERARD O'DWYER,
Individually and as Members of the New York City
Police Department; POLICE OFFICER JOHN DOE
1-10,

                    Defendants.

------------------------------------------------------------------------X

**COMPLAINT AND JURY DEMAND**

**ECF CASE**

## PRELIMINARY STATEMENT

1.    This is a civil rights action brought by plaintiff Samuel Martinez ("Mr. Martinez" or "Plaintiff") for damages pursuant to 42 U.S.C. § 1983 for his prosecution caused by the misconduct of the New York City Police Department ("NYPD") and the Brooklyn District Attorney's Office ("KCDA").

2.    This lawsuit seeks to hold the defendant CITY OF NEW YORK liable for misconduct under federal civil rights statute 42 U.S.C. § 1983 and *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). The unlawful actions of police detectives and prosecutors documented in this lawsuit resulted from affirmative or *de facto* municipal policies, practices, and customs that serve to violate the constitutional rights of criminal suspects and defendants, or from deliberate

indifference by policy-making officials, acting on behalf of the City of New York and the Kings County District Attorneys Office, to such conduct and violations.

3.     This lawsuit also seeks to hold liable the individual  defendants whose personal acts and omissions caused these violations.

## JURISDICTION AND VENUE

4.     This action arises under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

5.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 1367(a).

6.     The acts complained of occurred primarily in the Eastern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

7.     This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

8.     Plaintiff has complied with all of the conditions precedent to the commencement of this action.

## JURY DEMAND

9.     Plaintiff demands a trial by jury in this action.

## PARTIES

10.     Plaintiff, SAMUEL MARTINEZ, is a citizen and resident of the state of New York and resides in New York County.

11.     Defendant CITY OF NEW YORK, of which Kings County is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

12.     Defendant JOHN HOLMES was, at all relevant times, an assistant district attorney in Kings County, was employed by the City of New York as a member of the KCDA, acted toward Plaintiff under color of statutes, ordinances, customs, and uses of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

13.     Defendant MICHAEL VECCHIONE was, at all relevant times, the head of the Rackets Bureau in the KCDA, acted toward Plaintiff under color of statutes, ordinances, customs, and uses of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

14.     Defendant GERARD O'DWYER was, at all relevant times, a detective employed by the NYPD, acted toward Plaintiff under color of statutes, ordinances, customs, and uses of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

15.     JOHN DOE defendants

16.     The KCDA is an agency of the CITY OF NEW YORK. The District
Attorney and assistant district attorneys are agents and employees of the City of
New York, which is legally responsible for torts they commit within the scope of
their employment and under color of law.

17.     The NYPD is an agency of the CITY OF NEW YORK. Detectives and
police officers employed by the NYPD are agents and employees of the City of New
York, which is legally responsible for torts they commit within the scope of their
employment and under color of law.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Introduction

18.     On February 24, 2006 around 5:00 a.m. a fire broke out in a four-story
apartment building at 1033 Pacific Street in Brooklyn ("1033 Pacific").

19.     Witnesses reported heavy smoke pouring from the windows on the
upper floors of the building. Multiple fire and police vehicles responded to the scene
within five minutes of the first report of fire.

20.     As a result of this fire, four people were killed, including two infants.

21.     An investigation by the NYPD arson unit determined that this fire had
been started intentionally.

22.     The tragic nature of this fire, as well as the ensuing publicity, caused
the NYPD to devote great resources in an effort to catch the arsonist.

### B.     The Initial Investigation

23.     Immediately after the fire was extinguished, NYPD and fire department personnel began interviewing witnesses.

24.     Law enforcement was provided with many leads as to the perpetrator(s) of this crime.

25.     Several residents of 1033 Pacific told investigators that there had been many people in and out of the building at all hours, that the lock on the front door was often broken, and that they believed residents of a second floor apartment were dealing illicit drugs.

26.     A self-described drug user named Hiram Santos, told an NYPD detective that he had bought drugs from Apartment 2L at 1033 Pacific several times. Santos described two encounters he witnessed in the week leading up to the fire between an unknown black male and the dealer Santos bought drugs from in Apartment 2L.

27.     In the first encounter, Santos overheard the black male ask the dealer, "Are you going to do it?" The dealer replied that he would not, because he and his family lived there.

28.     Two days later Santos walked into 1033 Pacific and saw the same black male talking to the dealer, telling him that he had to "do it." Again the dealer replied that he was not doing anything because his family lived there.

29.     The black male pointed to another black male who was with him and said to the dealer, "If you don't do it, he will." The dealer cursed at the black male and went into his apartment.

30.     An NYPD detective showed Santos a photo of a man named Jason Fernandez, and Santos identified him as the dealer in Apartment 2L.

31.     Carol Samson, a resident of the second floor of a building near 1033 Pacific, , told an NYPD detective that she was awakened minutes before the fire by a loud verbal exchange on the street between a man, who sounded dominating, and a woman, who sounded intimidated.

32.     Samson heard the woman say, "No, no I won't." Samson believed the woman to be a resident of the block named Janice, a drug user who went up and down the block regularly. Samson said she was alarmed to hear Janice, who could handle herself, sounding so intimidated.

33.     A few minutes later, Samson looked out her front window and saw a man in a hooded parka looking up, calmly motioning with his hands, and quietly saying, "Get out." Then she heard someone yell, "Fire!"

34.     Jennifer Bynum, a resident of the fourth floor of the building adjoining 1033 Pacific, told an NYPD detective that she was awakened the morning of the fire by a loud noise, followed by what sounded like a struggle, emanating from the 1033 Pacific side of the wall.

35.     Going to her front window, she heard someone say, "Are they fighting?" When she looked out, she saw a black male in a dark-colored parka looking up at her, calmly motioning with his hands, and quietly saying, "Come out, get out." Then she began to smell smoke.

36.     Fire Marshals took several samples of debris, including carpet and base molding, from the back of the first floor hallway, where the fire originated. Testing by NYPD criminalists revealed the presence of a heavy petroleum distillate, such as kerosene or fuel oil, in several samples.

37.     The presence of a heavy petroleum distillate, along with the ferocity of the fire, the general lack of material in the hallway to serve as fuel, and the good condition of the electrical wiring, led  the lead fire investigator to deem the fire "non-accidental."

### C.    The Second Pacific Street Fire on February 24, 2006

38.     Also on February 24, 2006, about one hour after the fire started at 1033 Pacific, another fire broke out at 1162 Pacific Street, a four-story residential building two blocks away. All occupants there escaped unharmed.

39.     Firefighters who responded to 1162 Pacific later reported to a fire department investigator that there was a heavy odor of kerosene or gasoline in the stairwell.

40.     The investigator found that the fire was caused by an ignitable liquid in newspapers stacked on the landing between the first and second floors.

41.     On March 14, 2006, the fire investigator interviewed a man who claimed to be one of two owners of 1162 Pacific, Carlyle Ebanks.

42.     Ebanks said that there had been a lot of traffic to the first and fourth floor apartments, that every time he fixed the front door lock someone would break,

and that he thought a person involved in a dispute with a building resident over drug dealing had started the fire.

43.     Further investigation of the building and of Ebanks revealed a mortgage fraud scheme involving straw buyers and staged sales of real property, including 1162 Pacific.

44.     In addition, Ebanks collected more than $50,000 in insurance money after the fire by falsely representing himself as the owner of 1162 Pacific. In May 2008, with the participation of defendant NEUBAUER, the KCDA obtained indictments of Ebanks and his partner in the scheme.

45.     Ebanks was convicted at trial in February 2010 of Falsifying Business Records in the First Degree and Grand Larceny in the Second Degree.

46.     In August 2006, Defendant ARREDONDO took a message from an anonymous caller to the TIPS line. The caller said he had overheard a man named Jean Louisma of 413 Remsen Avenue in Brooklyn telling someone that he intended to burn down 1033 Pacific, then buy the property from the present owner.

47.     The anonymous caller also stated that, on the morning of the fire he heard Louisma say that the fire had gotten out of control and was drawing too much publicity, so he was going to "leave it alone."

48.     Despite the manpower and expense devoted to this matter, the NYPD was unable to arrest a perpetrator.

49.     There was in fact a spate of fires attributed to arson in the weeks immediately prior to this incident.

50.    The Defendants prosecuted plaintiff based on the theory that Plaintiff started this fire as retaliation against a drug dealer living at 1003 Pacific.

51.    Evidence that there were a number of arsons in the time period immediately prior to this incident negates the Defendants' theory of prosecution.

52.    Despite the potentially exculpatory nature of these other fires, it was never revealed to plaintiff's criminal defense attorneys

### D.    INFORMANT 1

53.    In May 2006 a young man who had been arrested for criminal trespass in the 77th Precinct ("INFORMANT 1") spoke with an NYPD detective about becoming an informant.

54.    Despite living just blocks away from 1033 Pacific and knowing about the fire, INFORMANT 1 offered information only after finding himself in police custody facing criminal charges. INFORMANT 1 was paid for his cooperation.

55.    In August 2006 NYPD detectives interviewed INFORMANT 1 at the KCDA and made both an audio recording and a transcript.

56.    INFORMANT 1 said that he had known Jason Fernandez, the drug dealer and alleged arson target who resided in Apartment 2L at 1033 Pacific, for the previous three or four years and used to steer drug buyers to the Fernandez's apartment.

57.    INFORMANT 1 said that in April 2006 he overheard three "Spanish" men talking outside a corner store at Classon Avenue and Dean Street.

58.     INFORMANT 1 said the men were speaking Spanish (which he did not understand) when he first saw them, but then they switched to English.

59.     He said he recognized one of them, whom he referred to as "Jose," who used to commit burglaries and from whom INFORMANT 1 had bought laptops, cell phones, and video game consoles.

60.     He said Jose often bought drugs from Jason Fernandez.

61.     INFORMANT 1 claimed he heard Jose say that he never meant for any kids or adults to get killed, he just wanted to set the place on fire, because "he sold me bad drugs, so F him."  INFORMANT 1 said the men then went back to speaking Spanish.

62.     As of August 2006, INFORMANT 1 had a criminal record for convictions from three states, including a conviction for Attempted Theft by Deception in New Jersey. Defendants knew this when they decided to use him as an informant.

63.     In May 2007 NYPD detectives interviewed Plaintiff in prison.

64.     Plaintiff was incarcerated on a separate matter and had been in custody since shortly after the arson in 2006.

65.     Plaintiff denied any involvement with or knowledge of the Pacific Street fires.

66.     In March 2007, INFORMANT 1 was arrested by Massachusetts State Police on suspicion of passing false traveler's checks.

67.     In March 2008, INFORMANT 1 was indicted in United States District Court for the District of Vermont for conspiracy concerning the passing of counterfeit checks.

68.     In a pretrial detention motion, the Assistant United States Attorney on the case noted that INFORMANT 1's National Crime Information Center ("NCIC") record covered four states, and included ten aliases and five dates of birth.

69.     The government also noted that INFORMANT 1 had made false statements to the pretrial services officer and that his statements were contradicted by the statements of his own family.

70.     In June 2009, INFORMANT 1 pleaded guilty to the federal charge of conspiracy to pass counterfeit checks. In September 2009, he was sentenced to a term of 36 months imprisonment in federal prison to be followed by three years of supervised release.

71.     In January 2011, INFORMANT 1 pleaded guilty in a Massachusetts state court to Larceny over $250 by False Pretenses and Uttering a False, Altered, Forged, or Counterfeit Note for offenses he committed in 2007. He was sentenced to 17 days in jail.

72.     In September 2011, INFORMANT 1's term of supervised release in the federal case was revoked after he pleaded guilty to a charge of Failure to Complete Residential Re-entry Center. He was sentenced to a term of seven months imprisonment, to be followed by two years of supervised release.

73.     In December 2011, two fire marshals and Defendant HOLMES interviewed INFORMANT 1 at the federal detention center in Brooklyn. Prior to the interview, they had INFORMANT 1 listen to the audio recording and read the transcript of his August 2006 interview at KCDA's office.

74.     At the time of the 2011 interview, Defendant HOLMES was aware of INFORMANT 1's extensive and unmitigated history of fraud and dishonesty.

75.     During this interview, INFORMANT 1 repeated his statements about working for Jason Fernandez and overhearing Jose admit to setting the fire.

76.     He said he did not know anything more than what he told the police in 2006, but he would be willing to help find the person who started the fire.

### E.    <u>INFORMANT 2</u>

77.     Sometime in late 2011 Defendant O'DWYER and HOLMES, brought in a second informant ("INFORMANT 2"), a state prisoner who in the custody of the State of New York.

78.     INFORMANT 2, was serving a sentence of fifteen and one-half years to life imprisonment for several violent offenses, and suffered from severe delusional paranoi.

79.     INFORMANT 2's mental illness had been demonstrated in a variety of manners, including by writing bizarre letters to judges that presided over his prior prosecutions. In these letters, he made statements that could only be understood by a reader as the product of mental illness, such as claiming that he and one of the judges were close friends and had often played basketball together.

80.     At no point did defendant HOLMES reveal INFORMANT 2's mental health history to any of plaintiff's criminal defense attorneys.

81.     With full knowledge of INFORMANT 2's mental illness, Defendants O'DWYER and HOLMES had him placed in close proximity to Plaintiff at Otisville Correctional Facility for the express purpose of extracting and reporting incriminating statements from plaintiff.

82.     In February 2012, Defendant HOLMES and two New York City fire marshals traveled to Otisville to interview Plaintiff in prison. Plaintiff, who was without an attorney, told the three visitors that he used drugs and stole things to support his habit while living in Brooklyn.

83.     He also told them that more than once he had bought drugs on the second floor of 1033 Pacific from a dealer. He told them that he had never had an argument with the dealer, that the drugs were always good, and that there were no problems between he and the dealer. He denied starting any fires.

84.     Defendants HOLMES and O'DWYER arranged for INFORMANT 2 and plaintiff to be in proximity of each other while incarcerated in Otisville.

85.     INFORMANT 2 initiated a relationship with plaintiff in Otisville.

86.     INFORMANT 2 was aware that he was seeking information about a past crime, but was unaware of the nature of the crime.

87.     INFORMANT 2 knew that by providing useful information, he would receive monetary compensation and assistance before the parole board.

88.     In an effort to please defendants HOLMES and O'DWYER, and thus receive the benefits of his agreement with the defendants, including the lessening of his own prison sentence, INFORMANT 2 created a series of fictitious statements that INFORMANT 2 attributed to plaintiff.

89.     None of these alleged admissions by plaintiff mentioned arson, or even simply a fire.

90.     On or about February 6, 2012, INFORMANT 2 told O'DWYER that plaintiff had stated that he did not want to return to Brooklyn upon his release from prison because prior to his incarceration he had shot someone while committing a home invasion.

91.     Defendants O'DWYER and HOLMES were aware that this purported statement by plaintiff was a fabrication by INFORMANT 2, and so made no inquiries concerning a corresponding shooting during a home invasion.

92.     INFORMANT 2 described plaintiff as "vague" in his description, and also claimed that plaintiff had left some unknown piece of evidence at plaintiff's mother's home in New Jersey.

93.     Defendants O'DWYER and HOLMES were aware that this purported statement  by plaintiff was also a fabrication by INFORMANT 2,Disregarding this "tip," they did not seek a search warrant of plaintiff's mother's home.

94.     Instead they sent this informant, who (a) they previously knew was unreliable and mentally ill, and (b) had just lied to the defendants by making up

statements out of whole cloth and falsely attributing them to the plaintiff, back to continue speaking with plaintiff.

95.     In March 2012 Defendant HOLMES and the two fire marshals returned to Otisville to interview Plaintiff again.

96.     Plaintiff told O'DWYER and HOLMES that he had purchased drugs at 1033 but had no idea when he was last there.

97.     In response to questions from O'DWYER and HOLMES about the night before the fire, plaintiff told them he could possibly have been in the building four hours before the fire broke out, or possibly one hour before the fire broke out, he really did not know when he was last at 1033 Pacific.

98.     On March 23, 2012, INFORMANT 2 informed defendant O'DWYER that plaintiff stated "they can come to talk to me as much as they want if I make it to next year without going to court I'm good."

99.     Plaintiff never made any such statement to INFORMANT 2.

100.    INFORMANT 2 also claimed that an inmate named "Farmer" told INFORMANT 2 that plaintiff had told Farmer that he had got away with more crimes in Brooklyn than he (Farmer) had been caught for and that he (Martinez) had killed people in Brooklyn and gotten away with it.

101.    INFORMANT 2 also claimed that plaintiff told INFORMANT 2 that plaintiff believed that his own mother was working for the police.

102.    Defendants O'DWYER and HOLMES were again aware that these purported statements by plaintiff were fabrications, which only further reinforced defendants' knowledge that INFORMANT 2 was an unreliable informant.

103.    Disregarding this "tip," defendants never sought to speak with "Farmer."

104.    The Defendants, however, were undeterred by this series of fabricated statements by the demonstrably unreliable INFORMANT 2, whom the Defendants sent back once again to speak with plaintiff.

105.    On March 27, 2012, INFORMANT 2 once again spoke with plaintiff. INFORMANT 2 claimed that Martinez made various spontaneous statements to him. Each of these statements was oblique and did not mention any specific crime.

106.    For example, INFORMANT 2 claimed that plaintiff claimed that he was not going to Brooklyn because "you know that case" and later on stated that he really "dumbed out."

107.    None of these statements furthered HOLMES's and O'DWYER's agenda as they did not implicate plaintiff in the 2006 arson or provide any basis to believe that plaintiff had any remote involvement in that crime. Later, during this same conversation between O'DWYER and INFORMANT 2 on March 27, 2012 O'DWYER told INFORMANT 2 that it was "highly likely that Martinez could say things that INFORMANT 2 wouldn't understand but that INFORMANT 2 should report back everything that Martinez stated.

108.   Shortly thereafter, INFORMANT 2 informed O'DWYER, without providing a date or context, that plaintiff told INFORMANT 2 that detectives had come to see him and showed him photos from a crime scene, which caused plaintiff to "bug out."

109.   INFORMANT 2 also said that plaintiff said that he had stabbed someone and that he kept stabbing this person until his arm got tired.  Plaintiff never made any such statement to INFORMANT 2.

110.   INFORMANT 2 told O'DWYER that plaintiff  also stated that "I went there to get something and it wasn't what I was supposed to get."  Plaintiff never made any such statement to INFORMANT 2.

111.   Again, INFORMANT 2 fabricated these conversations in an effort to curry favor with the defendants and secure money and an early  freedom.

112.   None of these statements furthered HOLMES's and O'DWYER's agenda as they failed to implicate Martinez in the 2006 arson.

113.   They made no separate investigation into unsolved murders coinciding with Martinez's alleged description of events.

114.   Between March 28, 2012 and April 23, 2012 O'DWYER spoke on numerous occasions with INFORMANT 2.

115.   INFORMANT 2 provided no useful information concerning either the arson at 1033 Pacific or plaintiff. On April 23, 2012, HOLMES informed O'DWYER that he intended to use INFORMANT 2 in the Grand Jury the following week.

116. O'DWYER relayed this information to INFORMANT 2. O'DWYER told INFORMANT 2 to inform Martinez that he was going to "Brooklyn Family Court" and then report back plaintiff's reaction.

117. On April 26, 2012 INFORMANT 2 informed O'DWYER that plaintiff did not believe that INFORMANT 2 was going to Brooklyn to attend "Family Court."

118. Plaintiff believed that INFORMANT 2 was actually going to discuss plaintiff.

119. INFORMANT 2 claimed that plaintiff told INFORMANT 2 later that day that plaintiff stated "I'm not worried about that case cause dead people can't talk and I only told you a little about it."

120. Plaintiff further allegedly stated, "I should of (sic) sat on that I rushed into it I used to do my crime at night. I fucked around during the day and turned a burglary into a homicide."

121. INFORMANT 2 was aware that plaintiff was incarcerated on charges of burglary. He was not aware that the crime for which defendants sought information occurred at approximately 5:00 a.m.

122. INFORMANT 2 supplied defendants no information connecting plaintiff to the arson.

123. Indeed, the information provided by INFORMANT 2 had been proven untrue.

124. Nevertheless, Defendant O'DWYER and HOLMES arranged to have INFORMANT 2 brought from Otisville to Brooklyn for debriefing with himself, other NYPD detectives, and Defendant HOLMES for testimony before the Grand Jury.

125. Defendant HOLMES was acting in his investigative capacity throughout his involvement in the selection and recruitment of individuals to work as informants in the investigation into plaintiff and/or the arson at 1033 Pacific.

126. Defendant Holmes was acting in his investigative capacity during his meetings with the informants and his discussions with O'DWYER concerning the use of the informants, the statements and evidence the informants sought to provide, and the Defendants' ongoing decision to continue using said informants despite the informants' repeated fabrication of evidence.

127. At no time did HOLMES, or any other member of the KCDA, inform Plaintiff or his counsel that either informant had provided unreliable, much less outright false, statements to the Defendants.

128. At no time did HOLMES, or any other member of the KCDA, inform Plaintiff or his counsel that either informant had a history of mental illness or that either had engaged in conduct that undermined their reliability.

129. At no time did HOLMES, or any other member of the KCDA, inform Plaintiff or his counsel that either informant had a criminal history saturated with allegations of and convictions for fraud and acts undermining his veracity.

130.   At no time prior to did HOLMES, or any other member of the KCDA, inform Plaintiff or his counsel that at least three other fires had been set in close time and proximity to the arson at 1033 Pacific , which would have undermined the KCDA's theory that Plaintiff had set the fire at 1033 Pacific due to his conflict with a drug dealer located in the building.

131.   **Each of these exculpatory facts was discovered by Plaintiff's defense counsel's independent investigation**.

## F.   THE GRAND JURY PRESENTATION

132.   Defendant HOLMES began his grand jury presentation in May 2012.

133.   The first witness called by HOLMES  was a self-described drug user who had bought drugs regularly at 1033 Pacific Street in early 2006.

134.   Just as Plaintiff had previously told HOLMES, this witness testified that the quality of the drugs from 1033 Pacific was good, and there never came a time when the drugs were not so good.

135.   HOLMES then called INFORMANT 1 to testify.

136.   INFORMANT 1 repeated his statements about working for Jason Fernandez in early 2006.

137.   He said he was familiar with the man he called "Jose" because Jose regularly bought heroin from Jason Fernandez in the three or four months leading up to February 2006.

138.   INFORMANT 1 then told the Grand Jury something he had not said in his 2006 or 2011 interviews with law enforcement officers about the fire.

139.   He testified that he witnessed Jose have an argument with Jason Fernandez, in which Jose complained about bad drugs and asked for his money back.

140.   INFORMANT 1 testified that after both he and Fernandez told Jose he was not getting his money back and to get out, Jose got mad, cursed them, and left the building.

141.   INFORMANT 1 told the Grand Jury the story about overhearing the three "Spanish" men outside the corner store about a month after the fire.

142.   This time, however, INFORMANT 1 said he was "right next to them" as he made this "admission."

143.   INFORMANT 1 testified that in a previous interview with law enforcement personnel, he had picked out a photo of Jose.

144.   HOLMES deliberately withheld INFORMANT 1's history of perjury and fraud from the Grand Jury.

145.   INFORMANT 2 was then called to testify.

146.   INFORMANT 2 testified that he met plaintiff in February, 2012 in the Otisville Correctional Facility; a state of New York prison.

147.   Once plaintiff arrived in Otisville, INFORMANT 2 spoke with plaintiff every day.

148.    Multiple times during INFORMANT 2's grand jury testimony, at the behest of defendant HOLMES, INFORMANT 2 interjected inappropriate hearsay designed to impugn the character of plaintiff.

149.    For example, Defendant HOLMES asked INFORMANT 2 had plaintiff indicated to INFORMANT 2 "how the heroin effected (sic) him," INFORMANT 2 responded "…the heroin kept him [plaintiff] committing crimes and doing things to get it."

150.    INFORMANT 2's statement was elicited directly by Defendant HOLMES's question.

151.    Defendant HOLMES, then instructed the Grand jurors "disregard that part of Mr. Martinez's statement."

152.    Under HOLMES's direction, INFORMANT 2 testified Martinez told him that some law enforcement officer came to him and showed him some pictures of an old, 2006 crime; and that plaintiff "…was, you know, a little upset about it."

153.    It is likely, if this conversation occurred at all, that plaintiff was upset by photos of babies that had been burned alive in the 2006 arson.

154.    It was never revealed to the grand jurors that these highly disturbing photos had been shown to plaintiff.

155.    INFORMANT 2 provided no direct information linking plaintiff to any specific crime.

156.    INFORMANT 2 told the Grand Jury that plaintiff told him that he wasn't scared because "dead people can't talk. You're [INFORMANT 2] the only one I told about the case, so nah, I'm not worried…"

157.    INFORMANT 2 then told the Grand Jury that plaintiff claimed that he "usually do his shit in the daytime but however, he did this at night time and I fucked around and turned a burglary into a homicide."

158.    This directly contravenes INFORMANT 2's April 26, 2012 statement to O'DWYER that "[plaintiff] usually do his shit in the nighttime but however, he did this during day time and I fucked around and turned a burglary into a homicide."

159.    The underlying arson occurred at 5:00 a.m.

160.    Defendant HOLMES then asked the Grand Jurors if "everybody" heard what INFORMANT 2 had just said.

161.    INFORMANT 2 testified that in the week prior to his grand jury testimony plaintiff told him to not tell anyone about the discussions that INFORMANT 2 and plaintiff had held; because you "can fuck [plaintiff] me up. Don't go down there telling them nothing we spoke about."

162.    Defendant HOLMES was aware that INFORMANT 2 had not procured any information concerning the arson.

163.    Despite this, he allowed the grand jurors to be misled by INFORMANT 2's oblique references to an unnamed crime.

164.     INFORMANT 2's testimony concerning plaintiff's statements were presented to the Grand Jury out of context, creating the false impression that credible evidence existed connecting plaintiff to the arson.

165.     Defendant HOLMES withheld from the Grand Jury INFORMANT 2's long, history of criminal behavior and severe mental illness.

166.     Defendant HOLMES withheld from the Grand Jury that INFORMANT 2 had previously fabricated statements and falsely attributed them to plaintiff in the hope of procuring personal benefits from the Defendants.

167.     Despite this knowledge, he proffered INFORMANT 2 as a perfectly credible witness in order to cast a shadow of guilt over plaintiff.

168.     When a member of the Grand Jury asked what benefit INFORMANT 2 received for his testimony, INFORMANT 2 replied that he received no benefit.

169.     Defendant HOLMES, was aware that this was a lie. In fact INFORMANT 2 had been paid $1,200 to act as an informant.

170.     Furthermore, in August 2012, Defendants O'DWYER rewarded INFORMANT 2 by writing a letter on his behalf to the Parole Board, requesting its consideration of the information INFORMANT 2 had provided in "newsworthy" cases, including the case against Plaintiff.

171.     In August 2012 Defendant HOLMES too rewarded INFORMANT 2 by writing a letter on his behalf to the Parole Board. . The letter stated that INFORMANT 2's testimony "will establish critical evidence in a complex trial."

172.    Although HOLMES was well aware that INFORMANT 2's statement to the Grand Jury that he had not received any benefit for his testimony was a blatant lie, HOLMES did not make any effort correct INFORMANT 2's false statement despite an obligation to do so.

173.    Although it had denied INFORMANT 2 parole at his prior three hearings, the Parole Board granted him parole following its receipt of the letters from Defendants O'DWYER and HOLMES, and he was released in October 2012.

174.    At the time of the indictment Plaintiff was serving a prison sentence for attempted burglary and had an April 2013 conditional release date.

175.    In June 2012, Plaintiff was indicted on multiple counts of Murder in the Second Degree for allegedly setting a fire that killed four people in February 2006.

176.    Shortly after plaintiff's indictment, Defendant Vecchione told multiple media outlets, including CBS news, that plaintiff knew things that "only the arsonist would know". Vecchione claimed that plaintiff knew "the way the fire was set and what he [plaintiff] used to start the fire."

177.    Vecchione's statements were false and there was no reasonable basis for Vecchione to have believed otherwise. No evidence exists indicating that plaintiff had any knowledge about how the fire was set, what was used to start the fire, or any other information concerning the arson.

178.    Vecchione was acting outside of his capacity as a judicial officer when he voluntarily made these false and inflammatory public statements.

179.    Defendants built their case against Plaintiff on the statements of two INFORMANTs whom they knew to be unreliable—one a drug addict with a history of fraud, the other a state prisoner suffering from paranoid delusions.

180.    Despite repeated request from Plaintiff's defense attorney, defendant HOLMES, under the supervision of VECCHIONE, refused to identify their two informants.

181.    HOLMES and VECCHIONE vehemently opposed plaintiff's defense counsel's motions to reveal the identities of the informants.

182.    Only when court-ordered to do so, did HOLMES and VECCHIONE identify the INFORMANT 1 and INFORMANT 2.

### G.    THE DISMISSAL

183.    Plaintiff's criminal defense attorney uncovered these serious defects by obtaining the Informant 1 and Informants 2's past criminal files via Court Ordered subpoenas.

184.    In April 2014 plaintiff's criminal defense attorney, having uncovered defendants' cover-up, moved to dismiss all charges against plaintiff.

185.    Defendants initially opposed this motion.

186.    After reading these motions, the presiding judge questioned the People about their failure to disclose this information.

187.    In May 2014, all charges against plaintiff were dismissed on the People's motion.

188.   At the time of the dismissal, Holmes was the prosecutor assigned to this matter.

## FIRST CAUSE OF ACTION

(1983 Malicious Prosecution and Denial of Due Process
and a Fair Trial as to O'DWYER, HOLMES, and Vecchione)

189.   Plaintiff repeats and realleges each and every preceding allegation contained herein.

190.   During the course of the investigation into the arson prior to the commencement of criminal process against plaintiff, defendants O'DWYER and HOLMES made a decision to utilize Informant 1 and Informant 2 in their investigation into plaintiff with the expectation that Informants 1 and 2 would one or another be a source of evidence against laintiff.

191.   The defendants made the decision to utilize Informant 1 in this manner even though they knew that Informant 1 was a fundamentally unreliable witness whom the defendants knew was a convicted fraudster and serial liar.

192.   The defendants made the decision to utilize Informant 2 in this manner even though they knew that Informant 2 was a fundamentally unreliable witness whom the defendants knew was mentally ill, had been diagnosed as a paranoid schizophrenic, and had a history of making outlandish, fantastical, and thoroughly fictional statements.

193.    Informant 2 was placed in a cell near plaintiff and encouraged to befriend and extract from plaintiff inculpatory statements.

194.    On a number of occasions during the course of the investigation, Informant 2 reported to the defendants a variety of obviously fabricated self-incriminating statements concerning the murders at 1033 Pacific which plaintiff had not actually made.

195.    That these inculpatory statements had been fabricated by Informant 2 was facially obvious to O'DWYER and HOLMES as they were entirely inconsistent with the facts known to the defendants, and the defendants must have known that Informant 2 was manufacturing these statements in an attempt to please the defendants.

188.    Despite defendants' knowledge that Informant 2's reports were fictional and thoroughly unreliable, they left him in place with instructions to obtain inculpatory statements from plaintiff. Informant 2, who knew that plaintiff had allegedly engaged in some sort of burglary, eventually told defendants that plaintiff had told him that he had committed a burglary that turned into a homicide.  Plaintiff had never made any such statement and defendants, who were well aware that Informant 2 had fabricated all of plaintiff's supposed prior admissions, knew that this was so.

189.    Throughout the course of these events, including the debriefings of and communications with Informant 2, both O'DWYER and HOLMES were acting entirely as investigators, and both engaged in this pattern of conduct with the

understanding and expectation that the evidence they were seeking to manufacture would later be used to commence and justify plaintiff's prosecution, and if defendants were successful, bring about his conviction for murder.

190.    Eventually, once he and O'DWYER were able to amass enough fabricated statements from Informant 1 and Informant 2, HOLMES took steps to initiate plaintiff's criminal prosecution.

191.    In May 2012, HOLMES, deliberately and knowingly relying on falsified information, procured plaintiff's indictment.

192.    In so doing, defendants O'DWYER and HOLMES knowingly and willfully manufactured, caused the manufacturing of, or otherwise knowingly encouraged the manufacturing false statements by Informant 1 and Informant 2, which they prepared and relied upon to justify commencing and continuing the criminal prosecution of plaintiff.

193.    These defendants withheld from plaintiff exculpatory or impeachment evidence that tended to negate plaintiff's guilt and which they knew or should have known the law required them to timely disclose.

194.    This evidence included, but was not limited to, the fact that Informant 1 and Informant 2 were fundamentally unreliable witnesses, that Informant 1 was a convicted fraudster and had presented falsely information to numerous courts, that Informant 2 was mentally ill and had been diagnosed as a paranoid schizophrenic, and that Informant 2 had falsely reported to them that plaintiff had made a variety of incriminating statements which defendants knew were false.

195.   By virtue of the foregoing, O'DWYER and HOLMES, with actual malice, initiated and continued, or caused the initiation and continuation of, criminal proceedings against plaintiff for which they knew, or should have known, there was no probable cause, and for which in fact there was no probable cause, and thereby caused plaintiff to be deprived of his liberty until the proceedings were ultimately terminated in plaintiff's favor.

196.   By virtue of the foregoing, O'DWYER and HOLMES fabricated, promoted the fabrication, and otherwise conspired to fabricate evidence, with the full understanding that said fabrications which flowed from both fabricated statements and the withholding of relevant evidence concerning Informant 1 and Informant 2 and their relevant conduct would be forwarded to the Kings County District Attorney (KCDA) for the purpose of bringing about plaintiff's prosecution and depriving plaintiff of his liberty.

197.   Both O'DWYER and HOLMES actively participated in the above misconduct or otherwise failed to intervene or take reasonable steps to protect the plaintiff from the unconstitutional conduct of the other defendants.

198.   During the time of the aforementioned events, defendant Vecchione was HOLMES's supervisor and was, upon information and belief, aware that HOLMES, while acting in an investigatory capacity, was seeking to manufacture a case against plaintiff through, in part, the above described use of Informant 1 and Informant 2.

199.   Although Informant 1 and Informant 2 were facially unreliable

witnesses who were deliberately submitting made up confessions and fabricated statements in the hope of pleasing the defendants, Vecchione failed to take reasonable steps to protect the plaintiff from the unconstitutional conduct of the other defendants.

200.    By so doing, the individual defendants O'DWYER, HOLMES, and Vecchione, individually and collectively, subjected the plaintiff to malicious prosecution, the deprivation of plaintiff's right to due process and to a fair trial through the use of fabricated evidence, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

201.    By reason thereof, the individual defendants O'DWYER, HOLMES, and Vecchione have violated 42 U.S.C. '1983 and caused plaintiff to suffer to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## SECOND CAUSE OF ACTION

(1983 Monell Claims Arising from NYPD Conduct)

202.    Plaintiff repeats and realleges each and every preceding allegation contained herein.

203.    The foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

204.     Prior to plaintiff's arrest, policymaking officials at the NYPD, with
deliberate indifference to the constitutional rights of individuals suspected or
accused of criminal activity, to the risk of arresting, prosecuting and convicting
innocent people, and to the right of all criminal suspects and defendants to due
process and a fair trial, implemented plainly inadequate policies, procedures,
regulations, practices, customs, training, supervision, and discipline concerning, in
part: (a) the use of excessive promises of rewards and unduly coercive interrogation
techniques with vulnerable potential witnesses, including drug users and addicts,
drug dealers, and/or individuals fearing prosecution and imprisonment for their
own criminal behavior; (b) the continuing duty of police investigators to preserve
and to make timely disclosure to prosecutors during criminal investigations and
prosecutions, of all material evidence or information (Brady material) favorable to a
person suspected, accused or convicted of criminal conduct, including, but not
limited to, evidence of innocence, evidence that an identifying or prosecution
witness is unreliable or lacks general credibility, evidence that a prosecution
witness has made inconsistent statements about material facts, and evidence that a
prosecution witnesses has a motive, bias or interest affecting his credibility or has
been pressured or coerced, so that the District Attorney could comply with his
constitutional obligation to disclose such information to the defense under Brady.

205.     The aforesaid deliberate or *de facto* policies, procedures, regulations,
practices and/or customs (including the failure to properly instruct, train, supervise
and/or discipline employees with regard thereto) were implemented or tolerated by

policymaking officials for the defendant City of New York, including but not limited to, the NYPD Commissioner, who had actual or constructive knowledge that these policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases, and understood that such issues often present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of misconduct or mishandling by NYPD members, as well as incentives that NYPD members have to engage in misconduct, and that such poor decision making or misconduct by NYPD members will frequently cause the deprivation of the constitutional rights of criminal suspects or defendant.

206. The municipal defendant was thus aware and has been aware of these ongoing issues, and there is credible evidence as articulated in a decision issued in the Eastern District of New York in *Collins v. City of New York*, 11 CV 766 (FB) (RML), that such misconduct (i.e., the failure to disclose *Brady* material) was tolerated by the municipal defendant.

207. The municipal defendant, acting through the NYPD and its executive officers, has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of Brady material.

208.   During all material times herein, the municipal defendant owed a duty to the public generally, and the plaintiff in particular, which the defendant knowingly and intentionally breached, or to which it was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

209.   The aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the aforesaid constitutional violations by the individual defendants.

210.   By reason thereof, the municipal defendant has violated 42 U.S.C. 1983 and caused plaintiff to suffer to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## THIRD CAUSE OF ACTION

(1983 Monell Claims Arising from KCDA Conduct)

211.   Plaintiff repeats and realleges each and every preceding allegation contained herein.

212.   The foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the defendant City of New York, amounting to deliberate

indifference to the constitutional rights of persons, including plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

213. At the time of plaintiff's original prosecution, and throughout most of the criminal prosecution of the plaintiff and his release from custody, then-KCDA Charles J. Hynes, as the manager and chief administrator of the KCDA, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Kings County, including, but not limited to, abuse of process, manufacturing of false evidence and testimony through improper coercion of witnesses, *Brady* violations, reliance on false or misleading evidence and argument at trial (the policy), and covering up the same.

214. This policy began with Hynes's induction as KCDA in 1990 and continued throughout the entirety of his 24 year tenure.

215. The policy permitted, encouraged, or acquiesced in the commission of, constitutional violations of the rights of individuals by prosecutors, detective-investigators, and NYPD detectives, particularly in high profile or serious cases where arrest and conviction is most desired by the KCDA. The policy led directly to the violations of plaintiff's constitutional rights prior to and during his prosecution.

216. More specifically, it was Hynes's policy to directly encourage, or be indifferent to and thereby indirectly encourage, prosecutors and detective-investigators, and NYPD detectives working with them, to coerce

vulnerable witnesses into giving inherently unreliable or false testimony favorable
to the KCDA.

217.   It was Hynes's policy as well to tolerate (and thereby encourage)
violations of the KCDA's constitutional obligation to make timely disclosure to the
defense of exculpatory or impeachment information known as Brady material. His
deliberate indifference to such violations created a lawless atmosphere within parts
of the KCDA wherein prosecutors, including VECCHIONE and HOLMES,
understood that withholding *Brady* material or engaging in other such misconduct
was an acceptable means to an end, and thereby caused the continuation of such
violations, including those that harmed plaintiff.

218.   Under Hynes's policy, prosecutors and investigators were permitted
and/or encouraged to "riding" policy, prosecutors were permitted and even
encouraged to make a record of statements that tended to inculpate a suspect or
defendant, while ignoring statements that were inconsistent with or adverse to
their belief as to a person's guilt or that otherwise would hamper the KCDA's ability
to obtain a conviction.

219.   Prosecutors, in violation of Brady, were permitted and/or encouraged
to refrain from disclosing material witness applications, orders, and proceedings,
relocation assistance promised or provided to witnesses, and other pressure tactics,
promises, or rewards used to influence witnesses.

220.   While prosecutors were told that they were, in theory, to comply with
their *Brady* obligations, they were not told there would be any negative consequence

to them if they failed to, and in fact there was none. As a result, KCDA prosecutors understood that their *Brady* obligations existed in name only.

221.   Upon information and belief, Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

222.   As has been previously alleged, Hynes and the municipal defendant were on notice that, in dozens of cases, courts had found that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady*, *Rosario*, or black-letter discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were disciplined. None of these prosecutors were fired, suspended, fined, or demoted. No adverse action was taken against them by the KCDA nor were they reported to any external disciplinary bodies.

223.   When confronted with such misconduct, the KCDA routinely defended the propriety of the misconduct carried out by the ADAs in question. Such a defense affirmatively announced his tolerance, if not outright approval, of his assistants' disregard of their *Brady* obligations and other misconduct.

224.   In the previously referenced EDNY case, Collins v. City of New York, 11 CV 766 (FB) (RML), the plaintiff Jabbar Collins detailed dozens of cases and instances over a period of many years evincing Hynes's policy.

225.   The complaint also set out in detail various occasions on which

defendant Vecchione engaged in various prosecutorial misconduct, to which Hynes's response was to proffer public support. Moreover, despite ample evidence of Vecchione's practice of ignoring his constitutional obligations and otherwise engaging in or abetting prosecutorial misconduct, Hynes continued to promote Vecchione within the KCDA, thereby signaling his endorsement of such conduct, and thereby reinforcing Hynes's existing policy.

226.    The foregoing violations of plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the municipal defendant arising from the City of New York's deliberate indifference to the constitutional rights of the public generally, and the plaintiff specifically.

227.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the municipal defendant, including, but not limited to, the District Attorney of Kings County and his delegates, who knew that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases, and understood that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that

employees have to engage in misconduct, misconduct, and that such poor decision making or misconduct by KCDA members and employees will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants.

228.   The municipal defendant, acting through the KCDA and his executive officers, has final responsibility for training, instructing, supervising, and disciplining KCDA personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the production of exculpatory evidence or any other fact(s) or evidence that interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation

229.   During all material times herein, the municipal defendant owed a duty to the public generally, and the plaintiff in particular, which the defendant knowingly and intentionally breached, or to which it was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the

public.

230.    The aforementioned policymaking officials had the knowledge

alleged in the preceding paragraphs, based upon, among other circumstances,

as noted above and as set out in exacting detail in the above referenced

*Collins v. City of New York*, numerous credible allegations, many

substantiated by judicial decisions and civil lawsuits, that police officers and

ADAs, including VECCHIONE, had wrongfully withheld, lost, or destroyed

evidence favorable to the defense that the prosecution had been required to

timely disclose to the defense under *Brady*, had presented or failed to correct

false or misleading testimony and argument, and/or had abused judicial

process to coerce false or inherently unreliable statements or testimony from

witnesses, all of which put the municipal defendant and KCDA on notice that

the City could be held liable for its failure to adequately train, supervise, or

discipline ADAs regarding their *Brady* and related due process obligations,

including their obligations not to abuse judicial process or coerce false or

unreliable statements and testimony, and of the inherent obviousness of the

need to train, supervise and discipline ADAs in their aforementioned

constitutional obligations to counteract the inherent pressure on prosecutors

to obtain convictions.

231.    Despite this knowledge, the supervisory and policymaking

officers and officials of the municipal defendant perpetuated, or failed to take

preventative or remedial measures to terminate, said policies, procedures,

regulations, practices and/or customs, did not effectively instruct, train

and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the general public. York.

232.   The aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the aforesaid constitutional violations by the individual defendants.

233.   By reason thereof, the municipal defendant has violated 42 U.S.C. 1983 and caused plaintiff to suffer to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## FOURTH CAUSE OF ACTION

(Malicious Prosecution under State Law as to All Defendants)

234.   Plaintiff repeats and realleges each and every preceding

allegation contained herein.

235.   By virtue of the foregoing, the individual defendants, including those employed by the KCDA, acting in concert with each other and with additional persons for whose acts they are liable, initiated, caused to be initiated, continued, or caused the continuation of, criminal process against plaintiff.

236.   The criminal prosecution terminated in plaintiff's favor.

237.   There was no probable cause for the commencement or the continuation of the criminal prosecution, nor would it have been objectively reasonable for the individual defendants to have believed that sufficient legal cause for the prosecution existed.

238.   The defendants acted with actual malice.

239.   Defendant City of New York is liable for the acts of its agents and employees, including those employed by the KCDA, under the principle of respondeat superior.

240.   Accordingly, the defendants are liable to plaintiff for subjecting him to malicious prosecution and causing him to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, plaintiff respectfully requests that judgment be entered:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.


Dated:        New York, New York
              September 8, 2015

                              ___/ss/_____

                              Robert Marinelli
                              305 Broadway, 9th Floor
                              New York, New York 10007
                              (212) 822-1427
                              robmarinelli@gmail.com