UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
SAMUEL MARTINEZ,

                        Plaintiff,

                                            15 CV 5182 (ERK) (SMG)

      -against-

CITY OF NEW YORK, JOHN HOLMES,
and GERARD O'DWYER,                        **AMENDED COMPLAINT**

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PRELIMINARY STATEMENT

      1.      This is a civil rights action brought by plaintiff Samuel Martinez pursuant to 42 USC §1983 with respect to his prosecution in New York State Court by the Kings County District Attorney's Office ("KCDA"). More precisely, plaintiff is alleging that the defendant John Holmes, who was at all relevant times a KCDA Assistant District Attorney, working in conjunction with defendant Gerard O'Dwyer, who was at all relevant times a Detective employed by the City of New York's Police Department ("NYPD"), fabricated, caused to be fabricated, or knowingly utilized fabricated evidence during and following an investigation into an arson and quadruple homicide to bring about plaintiff's indictment and criminal prosecution, and otherwise engaged in deliberate misconduct to mislead the grand jury and sustain the prosecution with the intent of compelling plaintiff to plead guilty to, or convicting plaintiff at trial of, crimes plaintiff had not committed.

      2.      Plaintiff is further alleging that the municipal defendant, the City of New York, is liable under §1983 and *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978) (the "*Monell* claims") because the unlawful actions of the individual defendants police were the

proximate result of affirmative or *de facto* municipal policies, practices, and customs within

the City with respect to the KCDA and NYPD that brought about the violations of

plaintiff's constitutional rights, or because the municipal defendant was deliberately

indifferent to its employees' conduct, despite its awareness that such violations had occurred

and were continuing to occur.  Such misconduct included, but was not limited to, the

knowing use of fabricated evidence and withholding of exculpatory evidence in order to

bring about indictments and to seek convictions in serious or high profile cases. The plaintiff

has further asserted state law claims against the municipality under a theory of vicarious

liability.

## PARTIES, JURISDICTION, and VENUE

3.      Plaintiff Samuel Martinez is an adult male resident of the state of

New York.

4.      At all relevant times hereinafter, defendant City of New York was and

is a municipal corporation duly organized and existing under and by virtue of the laws of the

State of New York and resides within Kings County, and which acts by and through its

agencies, employees and agents, including, but not limited to, the KCDA and the NYPD,

and their officers and employees.

5.      At all relevant times hereinafter, defendant John Holmes was, at all

relevant times, employed by the City of New York as a member of the KCDA as prosecutor

or assistant district attorney ("ADA").  He is sued in his individual and his official capacities.

6.      At all relevant times hereinafter, defendant Gerard O'Dwyer was, at all

relevant times, employed by the City of New York as a member of the NYPD wherein he worked as a Detective. He is sued in his individual and his official capacities.

7.      This Court has jurisdiction of the federal and concomitant state law claims in this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, as well as 42 U.S.C. § 1983.

8.      Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the defendant City of New York resides and where the majority of the actions complained of herein occurred.

9.      Plaintiff has complied with all of the conditions precedent to the commencement of this action.


**FACTUAL ALLEGATIONS**

**The 1033 Pacific Street Arson**

10.      On February 24, 2006, at about 5:15 a.m., a fire broke out in a four-story apartment building at 1033 Pacific Street in Brooklyn.

11.      As a result of this fire, four people were killed, including two infants.

12.      An investigation by the NYPD arson unit determined that this fire had been started intentionally.

13.       In response to this tragic fire, as well as the ensuing publicity, the City of New York devoted substantial resources to catch the arsonist.

14.      The efforts of investigators working with the NYPD, as well as the

3

City's Fire Department ("FDNY"), and the KCDA, generated a wide variety of leads but no

arrests, until plaintiff was indicted in 2012.


**The 1162 Pacific Street Fire, and Other Arsons**

15.     That same morning, at about 5:42 a.m., some thirty minutes after the

arson at 1033 Pacific Street, a fire was reported in an apartment building located two blocks

over at 1162 Pacific Street.

16.     Fortunately, the residents at 1162 Pacific Street were evacuated safely.

17.     The FDNY later found that the fire at this location, similar to the one

set thirty minutes earlier at 1033 Pacific Street, was caused by an ignitable liquid poured on

newspapers stacked on the landing between the first and second floors.

18.     The two Pacific Street fires, set some 30 minutes apart within a few

blocks of each other, on on February 24, 2006, were far from unique. In fact, according to

New York Magazine, between December 7 2005 and February 24, 2006, there had more

than 10 other fires in buildings located within a few blocks of 1033 Pacific Street, all of

which were considered "suspicious," if not arson, including several in January 2006 that were

found to have been intentionally set.


**The Initial Investigation**

19.     The investigation into the 1033 Pacific Street arson/murders yielded a

wide variety of possible witnesses, suspects, motives, and avenues of investigation.

4

20. These included witness statements and tips, anonymous and otherwise, concerning the 1033 Pacific Street fire, and evidence and information regarding the other recent fires in the neighborhood.

21. Suspects ranged from a black man in a hooded parka described by various eyewitnesses, to various people who would benefit financially by burning down an apartment building. Several witnesses identified a variety of individuals as the arsonist, while others named people they believed were involved in the events surrounding the fire. One such tip named a specific person whom the tipster claimed set the fire with the intention of devaluing and then purchasing the property , while other tips and information pointed to people connected to a drug dealer who lived at 1033 Pacific Street.

22. A contemporaneous investigation into the 1162 Pacific Street fire led investigators to the two purported owners, at least one of whom had collected on an insurance policy following the February 24, 2006 arson. In 2008 the KCDA secured an indictment of at least one of the alleged owners on an array of fraud charges and obtained his conviction following trial in 2010.

23. Investigators also concluded that a drug dealer named Jason Fernandez lived in Apartment 2L at 1033 Pacific Street, and thus the fire could conceivably have been set by a disgruntled customer, a rival dealer, or someone seeking to harm Fernandez or interfere with his drug business. At least one witness said Fernandez was involved in some sort of conflict or interaction involving individuals from the neighborhood on the morning of the fire.

24.     In short, a wide variety of witnesses provided investigators with tips and information implicating a large number of suspects, all of which were based on conversations or events the witnesses had seen or heard. None of these possible suspects were the plaintiff nor did investigators believe they were the plaintiff.

25.     Despite the array of motives and suspects, and the significant resources dedicated to investigating the arson and homicides, no arrests were made.

**Informant 1**

26.     In or about May 2006, a 23 year-old who had been arrested for criminal trespass spoke with a NYPD detective about becoming a paid informant ("Informant 1") and, on May 31, 2006, was registered formally as a Confidential Informant by the NYPD.

27.     On multiple occasions between May 31 and August 6, 2006, Informant 1 met with members of the NYPD, during which he made various statements about different matters, including an event shortly after the February 2006 fire in which he claimed to have overheard a conversation between three men, during which one man confessed to starting the fire.

28.     Informant 1 stated that he knew the supposed confessor as "Jose."

29.     Informant 1 later claimed to have identified Jose as the plaintiff from a photo array, and that he also identified one of the other men in the conversation, who is identified herein by his initials "P.S."

30.     The plaintiff never had such a conversation and never made the

statements as Informant 1 claimed.

31.     When P.S. was later questioned and shown a picture of plaintiff, he stated that he did not recognize plaintiff nor was he familiar with his name.

32.     As of August 2006, Informant 1, had already earned a criminal record for convictions from three states, including a conviction for Attempted Theft by Deception in New Jersey. The defendants knew this when they chose to utilize him as an informant.

33.     In August 2006, NYPD detectives and a KCDA ADA interviewed Informant 1 at the KCDA and made both an audio recording and a transcript.

34.     In relevant part, Informant 1 said that he had known Jason Fernandez, the drug dealer and possible arson target who resided in Apartment 2L, for at least three or four years, and steered buyers to Fernandez's apartment.

35.     According to Informant 1, in February 2006 Fernandez began selling poor quality narcotics, which prompted complaints from virtually all of his customers and many demands for refunds, which he and Fernandez refused to give.

36.     Informant 1 further said that, in April 2006,  he overheard Jose, P.S., and another man talking outside a corner store in the same neighborhood as 1033 Pacific Street. According to Informant 1, all three were Fernandez's drug customers, and that he was familiar with them as a result.

37.     According to Informant 1, the three men spoke in Spanish (which the Informant does not speak) before inexplicably switching to English, at which time he claimed Jose said that he never meant for any kids or adults to get killed, he just wanted to

7

set the place on fire, because "he sold me bad drugs, so 'F' him." The men then resumed speaking in Spanish.

38.     Informant 1, who was 23 years-old and already a proven inveterate liar and professional fraud, did not explain why Jose would have such an incriminating conversation in full public view.  Having just attempted to murder Fernandez, inadvertently causing the horrific deaths of four innocent people, Jose was not only openly admitting to the crime to others, but was doing so in front of the informant, whom Jose supposedly knew was Fernandez's friend and colleague.

39.     Informant 1 also stated that some customers had asked for refunds when Fernandez began selling bad drugs. However, Informant 1 never suggested that Jose was one of these people.

40.     In fact, he gave no indication that he had ever witnessed any sort of altercation or argument between Jose and Fernandez, or anybody else connected with Fernandez, at any time, and he certainly never suggested to have any knowledge of such confrontation or dispute prior to the February 24, 2006 fire.

41.     He further stated in his August 2006 meeting with the KCDA that these statements were what he had previously told the NYPD, and that these claims were the entirety of what he knew about the fire.

42.     In any event, Informant 1, whose statement about Jose's confession and alleged identification of plaintiff as Jose provided the only evidence linking plaintiff to the arson at 1033 Pacific Street fire, did not have a good track record for veracity as of

8

August 2006, and it was to become progressively worse.

**The Continued Investigation Stalls**

43.   Neither the NYPD nor the KCDA placed much stock in Informant 1's mid-2006 statement, as they did not bother to speak with plaintiff until May 2007, when NYPD detectives interviewed plaintiff in prison, where he was then incarcerated on a separate matter.

44.   While plaintiff had a lengthy history of drug use and criminal convictions, including for burglaries at various locations, he had no history of violence or arson or any other conduct remotely consistent with the 1033 Pacific Street fire.

45.   Plaintiff denied any involvement in or knowledge of the Pacific Street fires.

46.   Both Jason Fernandez and his brother Devon Fernandez had been interviewed by the NYPD. Upon information and belief, neither was asked whether they even knew Informant 1, much less had any sort of relationship with him, nor were they asked about any other part of Informant 1's claims, including their relationship with Informant 1's "Jose."

47.   Upon information and belief, neither of the Fernandez brothers were asked about plaintiff by name, nor were they shown plaintiff's photograph, and neither was asked if they could identify him, or if they had encountered him at any time.

48.   Upon information and belief, none of the former residents from 1033

Pacific Street were asked to identify plaintiff, nor did any other person put plaintiff at the crime scene on or around the date of the crime.

49.     For a time the investigation ground to a halt.

**The Defendants Focus on Plaintiff**

50.     By late 2011, defendants Holmes and O'Dwyer had begun handling the still open investigation into the arson/murders at 1033 Pacific Street.

51.     With the investigation at a standstill, Holmes and O'Dwyer decided to target plaintiff for the prosecution for these crimes, despite the absence of any evidence, other than the problematic statement offered by Informant 1.

52.     Thus, defendants were in a challenging position. Their only witness was not just a criminal, but a criminal whose modus operandi included fraud and deceit, and his claim was both facially implausible and uncorroborated by the other known witnesses.

53.     Moreover, the defendants were aware that, since giving his last statement in August 2006,  Informant 1 had been repeatedly arrested for various offenses that further established his proclivity for lying.

54.     Informant 1's known conduct included the following:

a.     In March 2007, he was arrested by Massachusetts State Police on suspicion of passing false traveler's checks;

b.     In March 2008, he was indicted in United States District Court for the District of Vermont for conspiracy concerning the passing of counterfeit checks;

c.     During the above federal prosecution, the government noted

10

that Informant 1's record covered four states, and reflected ten aliases and five different stated dates of birth;

d.    The government also noted that he 1 had made false statements to Pretrial Services;

e.    In June 2009, he pleaded guilty to the federal charge of conspiracy to pass counterfeit checks, leading to a sentence in September 2009 of 36 months imprisonment, to be followed by three years of supervised release;

f.    In January 2011, he resolved the 2007 Massachusetts state charges by pleading guilty to Larceny by False Pretenses and Uttering a False, Altered, Forged, or Counterfeit Note, for which he was sentenced to 17 days in jail; and,

g.    In September 2011, Informant 1 admitted to violating his federal supervised release and was sentenced to a term of seven months imprisonment, to be followed by further supervised release.

55.    These are but some of the various crimes and conduct concerning Informant 1 that occurred between August 2006 and late 2011.

56.    For instance, Informant 1 was charged with narcotics possession by the KCDA, under one of his many aliases, in 2008. The informant resolved the charge in April 2012 by pleading guilty to heroin possession in exchange for a plea of time served.

57.    Undeterred, in December 2011, Holmes and two Fire Marshals met with Informant 1 at a federal detention center in Brooklyn, by which time Holmes was well aware of Informant 1's ongoing criminal conduct.

58.    They had informant 1 review the audio recording and transcript of his August 2006 interview, following which Informant 1 repeated his earlier statements about working for Jason Fernandez and overhearing "Jose" admit to setting the fire.

11

59.     Notably, Informant 1 once again made no claim of any sort that he had

ever observed any confrontation between "Jose" and either of the Fernandez brothers at any

time or that there was any reason to believe Jose was upset with the Fernandez brothers prior

to the arson/murders.

60.     He further stated that he did not know anything beyond what he had

told the KCDA and NYPD in 2006.

61.     Accordingly, as of December 2011, the defendants still had no credible

evidence upon which to justify a continued investigation of plaintiff, much less initiate his

prosecution.


**The Defendants Recruit Informant 2**

62.     In or between December 2011 and January 2012, defendants O'Dwyer

and Holmes, recognizing the abject lack of credible evidence against plaintiff, set out to

create additional evidence by bringing in a professional jail house informer ("Informant 2").

63.     This informant, a long time criminal with a history of violence, had

worked with O'Dwyer over the past several years and been rewarded for his work as a jail

house informant with money and promises of assistance.

64.     The informant, who was serving a sentence of 15 and one-half years to

life imprisonment, had a demonstrated history of mental health issues that implicated his

reliability as a witness and was surely known to the defendants.

65.     The defendants arranged for Informant 2 to be placed in close

proximity to plaintiff at New York State's Otisville Correctional Facility for the express purpose of extracting and reporting incriminating statements made by plaintiff.

66.     Informant 2 was in place at Otisville by about January 13, 2012, and he immediately began reporting to O'Dwyer, whom the informant referred to familiarly as Gerry.

67.     Informant 2 knew and understood that he would be paid cash for his cooperation, as he had been for his prior work for O'Dwyer.

68.     Informant 2 also knew and understood that, in exchange for his assistance in providing evidence against plaintiff, Holmes and O'Dwyer would affirmatively assist him before New York's Parole Board, which had been previously unwilling to release Informant 2.

69.     Informant 2, who was unaware of the exact crime defendants were trying to pin on plaintiff, understood that it involved murder, as the prior assistance he provided O'Dwyer concerned cold murder cases, and that plaintiff had a history of burglary.

70.     Informant 2's initial reports were inconsequential and entirely non-inculpatory or suggestive of any past, present, or contemplated criminal conduct.

71.     In February 2012, two Fire Marshals went to Otisville to interview plaintiff, who willingly spoke with them. He was not read his rights nor was he represented by counsel at the interview.

72.     Holmes was either with the marshals, or received a report of the interview shortly thereafter.

73.    Holmes and O'Dwyer had arranged for the February 2012 interview in the hope that it would cause plaintiff to say something useful, either to the investigators or to Informant 2.

74.    Upon information and belief, prior to the February 2012 interview, Holmes and O'Dwyer, either themselves or through surrogates, communicated with plaintiff's mother and informed her they believed plaintiff had committed the arson/murders. Plaintiff became aware of this prior to or during the meeting with the Fire Marshals.

75.    During this meeting, plaintiff acknowledged that he was a drug user and that he had committed burglaries and larcenies to support his habit.

76.    Plaintiff further stated that he had been to 1033 Pacific Street to buy drugs on prior occasions but that he never had any issues or problems with either the drugs or the dealer, that he had no involvement with the fire, and that he could not understand why anybody was suggesting that he was somehow involved.

77.    In mid-March 2012, Holmes and the Fire Marshals returned to Otisville, whereupon they interrogated plaintiff a second time. Once again, plaintiff did not have an attorney present and was not read his rights before being questioned.

78.    Plaintiff again admitted to knowing and visiting the building for the purpose of buying drugs and having been inside the dealer's apartment. He also again denied any conflicts with anyone at the building or any knowledge of or involvement in the fire.

79.    Eventually, Holmes read plaintiff his Miranda rights and plaintiff

responded by asking for an attorney. Holmes then ended his interrogation.

80.     Meanwhile, O'Dwyer continued to press Informant 2 for inculpatory evidence against plaintiff.

81.     Informant 2 responded by telling O'Dwyer that plaintiff had made a series of admissions to various violent crimes and murders.

82.     Notably, none of these supposed statements by plaintiff concerned an arson or any other conduct remotely related to the 1033 Pacific Street arson.

83.     Moreover, none of these statements were true, and the defendants understood that they were not true, as reflected by the defendants' failure to act upon or investigate any of these supposed crimes.

84.     For example, in early February 2012, Informant 2 falsely stated to O'Dwyer that plaintiff had said he did not want to return to Brooklyn upon his release from prison because prior to his incarceration he had shot someone while committing a home invasion.

85.     Informant 2 further stated to O'Dwyer during this communication that plaintiff supposedly also stated that when he was younger he had performed "hits" for other people. Again, Informant 2 gave no further information as to the where, when, whom or for whom, of any of these various murders.

86.     Plaintiff made none of these aforementioned statements to Informant 2 and none of the supposed admissions were true.

87.     O'Dwyer promptly shared Informant 2's claims with Holmes. Both

15

defendants were aware that these purported admissions were fabricated by Informant 2, as indicated by the fact that the defendants responded by ignoring them.

88.     Instead, the defendants sent this informant, who they knew had a demonstrated history of mental illness and who had just provided them with absurd and fabricated claims, back with instructions to keep up the good work.

89.     In mid-March 2012, Informant 2 told O'Dwyer that an inmate named "Farmer" had told Informant 2 that plaintiff had confessed to Farmer that he had gotten away with more crimes in Brooklyn than Farmer had ever been caught committing.

90.     Informant 2 further stated that plaintiff had told Farmer that plaintiff had killed people in Brooklyn and gotten away with it. This confession, like each of the earlier ones concocted by Informant 2, was offered without details.

91.     Plaintiff made none of these aforementioned statements to Informant 2 and none of the supposed admissions were true.

92.     Once again O'Dwyer passed on Informant 2's claims to Holmes, and once again both defendants ignored them. The defendants made no any effort to identify the mysterious "Farmer" or confirm if any part of the supposed confessions were remotely true.

93.     On another occasion, Informant 2 told O'Dwyer that plaintiff told him that he had stabbed someone and that he kept stabbing this person until his arm got tired. Plaintiff never made any such statement to Informant 2 and the statement itself is false.

94.     Once again the defendants ignored Informant 2's fabricated allegations.

16

95.     In late April 2012, Informant 2 told O'Dwyer that plaintiff supposedly said, "I should of (sic) sat on that I rushed into it I used to do my crime at night. I fucked around during the day and turned a burglary into a homicide." This was another fabrication by Informant 2, as was obvious then for several reasons.

96.     First, every alleged prior inculpatory statement passed along by Informant 2 was facially false, as the defendants were well aware, and by the time of this communication, all such statements by this informant were presumptively fictitious.

97.     Second, the statement did not fit the undisputed facts known to the defendants, as Informant 2 was stating that crime occurred during the day when the arson at 1033 Pacific Street had occurred at 5:15 a.m., which was more than 80 minutes before sunrise.

98.     Third, the alleged confession reflects Informant 2's mistaken belief that the murder in question was the result of burglary gone bad. This is understandable, as Informant 2 already knew that the defendants were investigating a murder and that plaintiff had a history of burglary. Hence, Informant 2's statement can only be understood as an attempt to synthesize the information available to him into a confession he could sell to the defendants.

99.     This statement was as much a fabrication as his prior claims, such as plaintiff supposedly admitting to committing various murders for hire, shooting someone during a home invasion, stabbing another person repeatedly until he was too tired to continue, and having successfully committed more crimes in Brooklyn than one could count.

17

100.    The defendants elected not to take any investigative actions with respect to any of these very serious felonies. No effort was made to determine when any of these many murders had occurred, or whom plaintiff had killed, or how or why he had done it. That defendants chose to ignore these claims reflects their recognition that they were fictions created by Informant 2 and unworthy of defendants' time and attention.

101.    What Informant 2 did not provide was any admission connecting plaintiff to either the arson/murders at 1033 Pacific Street, or  or any other arson-related crime anywhere else.

102.    Notwithstanding the paucity of evidence to support any further action, Holmes elected to proceed against plaintiff.

103.    Upon information and belief, Holmes's supervisor at the KCDA during this investigation was ADA Michael Vecchione.

104.    Vecchione originally worked at the KCDA from 1973 to 1980. He returned in January 1992 and, within three months, was heading the Homicide Bureau. In April 2001 he became Chief of the Rackets Division, within which various units were housed, including, for example: organized crime, human trafficking, mortgage fraud, major fraud, and arson.

105.    As Chief of the Rackets Division, Vecchione reported directly to Charles Hynes and was responsible for supervising the staff and cases within the Rackets Division.  Vecchione remained in this position at all relevant times herein.

106.    Holmes was acting in his investigatory capacity as an ADA at the

KCDA at all relevant times prior to and during the recruitment of the informants and all of the concurrent steps during the investigation into the arson/murders in question, and all of the conduct he engaged in during and after this period was within the scope of his employment.

107.    O'Dwyer was acting in his capacity as a member of the NYPD throughout every phase of his involvement in this matter, from his initial acts during the criminal investigation into the underlying crimes, through the criminal prosecution of the plaintiff, and all of his acts therein were within the scope of his employment.

**The Grand Jury Presentation**

108.    Beginning on about April 24, 2012, Holmes began presenting evidence to a grand jury in Kings County with the intention of securing plaintiff's indictment for the February 24, 2006, murders at 1033 Pacific Street.

109.    Holmes knew that he lacked probable cause to prosecute plaintiff or to believe that such a prosecution could be sustained prior to and throughout his presentation of evidence to the grand jury.

110.    Holmes was in charge of selecting the evidence to be presented to the grand jury, choosing the witnesses who would testify, and preparing them for their testimony. He was responsible for determining what the grand jury would know, and more importantly, what they would not know, and he deliberately and intentionally exercised his broad powers to mislead and deceive the grand jury in order to ensure that plaintiff was indicted for the murders at 1033 Pacific Street, and did so by knowingly presenting fabricated

evidence and willfully eliciting testimony he knew to be materially false, and allowing such false and misleading evidence to be presented to the grand jury without correction. Holmes further drew out testimony that he knew was improperly obtained in order to smear and impugn plaintiff, even though such testimony had little or no connection to the crimes at issue, and withheld a vast amount of exculpatory evidence, including, but not limited to, the existence of other contemporaneous arsons, and, more importantly, that the two informants were, in fact, compensated informants with criminal histories and conduct exemplifying their abject lack of credibility.

111.    For example, Holmes called Fire Marshal Brian Kane for the purpose of presenting certain of plaintiff's statements during the February and March 2012 interrogations.

112.    Although plaintiff had made these statements without being read his rights, and the use of these statements would be subject to suppression, Holmes had Kane testify that plaintiff had told him that he was a drug addict and had bought drugs from 1033 Pacific Street.  Kane's version of plaintiff's statements was somewhat exaggerated but Holmes did not correct the testimony.

113.    Kane further testified that plaintiff admitted that he could have been at 1033 at or around the time of the fire. This testimony by Kane did not accurately reflect plaintiff's statements and was highly misleading. Plaintiff had steadfastly denied any knowledge of, or involvement in, the arson/murders, and further stated that, while he had bought drugs at the building, he had no idea when he had done so, hence his inability to

concretely deny being there at any particular point before the crimes occurred.  Holmes and Kane worked together to create the false impression that plaintiff had admitted to being present.

### *Informant 1*

114.    On at least one occasion prior to presenting his testimony, Holmes met with Informant 1 to prepare him for his upcoming appearance before the grand jury.

115.    Informant 1 testified in line with his 2006 and 2011 statements about assisting Jason Fernandez's drug sales in late 2005 to early 2006. He also testified similarly about overhearing Jose admit to setting the fire and that he knew Jose as one of Fernandez's drug customers. The latter testimony, while a self-serving creation made to help sell his value to the NYPD as an informant in 2006, was reasonably consistent with his prior claims.

116.    However, Holmes then asked Informant 1 "The person that you knew as Jose did you ever see him have any dispute with anybody about the drugs sold in 1033 Pacific Street" and, when Informant 1 answered affirmatively, asked the witness to describe the event to the grand jury.  This choreographed exchange was used by Holmes to introduce blatantly false testimony from Informant 1, which was created by Holmes and the informant sometime in or after December 2011.

117.    In response to Holmes's question, Informant 1 testified that, in February 2006, shortly before the fire, he witnessed Jose confront Jason Fernandez about having been sold bad drugs and that Jose demanded his money back.  Informant 1 further testified that after both he and Fernandez told Jose they would not return his money, Jose

became increasingly angry, cursed at them, and left the building.

118.    This was compelling and incriminating testimony and dovetailed neatly with both the KCDA's theory of the case and the alleged post-hoc admission by plaintiff that Informant 1 also claimed to overhear.

119.    The testimony by Informant 1 as to the confrontation between Jose and Fernandez was also a fabrication. Whether Holmes crafted the lie for his witness, or merely nodded and winked during the preparation process, three things are clear: Holmes knew the testimony was coming, Holmes knew it was a fabrication, and Holmes made sure that the grand jury had no idea that this was so.

120.    Informant 1 had repeatedly given statements to the NYPD and the KCDA between 2006 and 2011, which he claimed contained everything he knew. Never once had Informant 1 ever stated in any form that he had ever witnessed or heard of any pre-arson confrontation between Jose and Jason Fernandez. Never, that is, until he met with Holmes just before seeing the grand jury.

121.    Holmes did not correct this testimony nor inform the grand jury that it was inconsistent with Informant 1's prior statements.

122.    Holmes also caused or permitted Informant 1 to lie about his own drug use. More expressly, Holmes asked Informant 1 whether he had ever used drugs, to which Informant 1 responded that he had not.

123.    This testimony was false, as Holmes knew. Not only had Informant 1 been arrested numerous times for narcotics and marijuana possession, on the very day that

he was giving this testimony to the grand jury he was scheduled to appear in another courtroom to enter a guilty plea to possession of heroin. Moreover, about seven months earlier, in September 2011, Informant 1 had admitted to violating the terms of his federal supervised release by testing positive for marijuana at least three separate times during an appearance before a United States District Judge in the Eastern District of New York.

124.    Holmes inducted and accepted this false and misleading testimony without any hint that these claims were anything but truthful and credible.

125.    In fact, Holmes made sure the grand jury did not hear any evidence that would cause them to question Informant 1's veracity. For instance, Informant 1 was presented simply as a disinterested fact witness, rather than a professional informant whose testimony was given in exchange for money or possible assistance in other matters.

126.    Holmes further led the grand jury to believe that Informant 1's only criminal activity was limited to his minor role in the Fernandez drug dealing operation in the months leading up to the February 2006 fire. That Informant 1 was a recidivist with repeated convictions for crimes of dishonesty was never presented, nor was evidence that Informant 1 had numerous other arrests and convictions relating to the possession of narcotics, marijuana, and stolen property.

*Informant 2*

127.    On at least one occasion prior to presenting his testimony, Holmes met with Informant 2 to prepare him for his upcoming appearance before the grand jury.

128.    From the outset Holmes materially misrepresented Informant 2's

23

relationship to both the defendants and the plaintiff.

129.    In response to Holmes's questioning, Informant 2 testified that he and plaintiff happened to meet each other in jail, where they became friendly. At no point was the grand jury advised that Informant 2 was a compensated jail house informant, that his contact with plaintiff was orchestrated by the defendants, and that Informant 2 was acting as the defendants' agent under standing orders to secure admissions and evidence.

130.    When a grand juror asked about the compensation being offered for Informant 2's testimony, Holmes recalled Informant 2, whereupon the following exchange was had:

> Holmes:        [Informant 2], have you been promised anything in exchange for your testimony today?
>
> Informant 2:   Nothing whatsoever.

131.    This testimony was a lie, yet Holmes left it uncorrected as though it was truthful. In fact, Informant 2 had received substantial compensation from O'Dwyer over the years, and in this case had received and was promised that he would receive monetary compensation, as well as supporting letters from Holmes and O'Dwyer when he next appeared before the Parole Board.

132.    Holmes also drew out testimony from Informant 2 about how plaintiff had allegedly admitted to committing a burglary that went bad, resulting in a murder. In the grand jury, Informant 2 testified that plaintiff said that "he usually do his shit in the daytime but however, he did this at night time and [plaintiff] fucked around and turned a burglary into a homicide."

24

133.   This statement was fundamentally at odds with what Informant 2 had told O'Dwyer, in that Informant 2 was now claiming plaintiff admitted to committing this crime (i.e., the burglary) at night, when he had originally relayed that plaintiff said he committed the burglary during the day. The newly improved version of plaintiff's alleged confession made it more consistent with the actual time of the crime, but was diametrically opposite to his original statement to O'Dwyer.

134.   Holmes did not correct the statement or acknowledge the inconsistency.  Rather, he turned to the grand jurors and asked if they had all heard the statement, so as to emphasize its significance.

135.   As he had with Informant 1, Holmes made sure that the grand jury was completely unaware of any reason to doubt Informant 2's credibility or reliability.

136.   Holmes kept from the grand jury the catalogue of absurd admissions Informant 2 claimed plaintiff had supposedly made. There was no testimony about the supposed contract killings, the shootings, the stabbing, and general crime spree to which Informant 2 claimed plaintiff had admitted.

137.   While the grand jury necessarily knew that Informant 2 was a convicted criminal by virtue of his testimony about meeting plaintiff in prison, Holmes kept from the grand jury Informant 2's various crimes of conviction, including the murder that landed him in jail for a term ranging from 15 years to life.

138.   Holmes also kept from the grand jury Informant 2's prior conduct evincing the substantive mental health issues that implicated his reliability as a witness.

*Exculpatory and Selective Evidence*

139.   With respect to the grand jury proceedings, Holmes's selective presentation of evidence to the grand jury was not limited to presenting or allowing false and misleading testimony from the two star informants.

140.   Holmes utilized Kane and  Informants 1 and 2 to portray plaintiff as a drug addict and petty criminal who was connected to the building and Jason Fernandez, to support the theory that plaintiff was a disgruntled buyer who had set the fire to retaliate against Fernandez.

141.   That a mere 32 minutes later, another similarly suspicious fire had been set two blocks away would directly undermine that claim. The theory would be further damaged by the revelation that there had been a spate of other such suspicious fires within the neighborhood over the proceeding 12 weeks.

142.   Holmes addressed this issue by simply choosing not to tell the grand jury of the arson at 1162 Pacific Street, or any of the other suspicious fires that dotted the neighborhood over that winter, and similarly ensured that the grand jury had no idea that investigators had interviewed numerous witnesses, leading to the identification of various other individuals being responsible for, or knowledgeable of, the arson/murders.

143.   That there was no evidence connecting plaintiff to the arson/murders other than the purported admissions reported by the two informants, and Informant 1's belated claim to have witnessed a confrontation between plaintiff and Jason Fernandez, made it absolutely critical that the grand jury have no reason to question their testimony.

26

144.     Accordingly, Holmes not only elicited or utilized fabricated, perjured, or otherwise materially false testimony, but also sanitized these witnesses by hiding their criminal histories and relationship with the KCDA and NYPD.

145.     On May 22, 2012, the grand jury indicted plaintiff on eight counts of murder. More precisely, plaintiff was charged with the murder of the four victims as follows: four counts under both NY Penal L. §125.25(2) and §125.25(3).

146.     The plaintiff was arraigned in June 2012, at which time KCDA Charles Hynes publicly declared: "A tragedy like this cannot and will not be forgotten nor can a crime like this go unpunished. This is the culmination of an exhaustive six-year investigation led by the FDNY Bureau of Fire Investigation, the New York Police Department and my office, into a horrific fire that claimed the lives of four people, including a mother and her two young children."

**The Prosecution**

147.     Upon information and belief, Holmes was working under the supervision of ADA Michael Vecchione during the course of his investigation into the 1033 Pacific Street, and throughout the presentation of the case to the grand jury. This supervision and management of Holmes's activities and the prosecution of plaintiff continued thereafter.

148.     Holmes had initiated the commencement of plaintiff's indictment and prosecution by selectively utilizing evidence in a palpably improper and fraudulent manner. He did this by introducing evidence that he knew to be fabricated or materially false, and by

misleading the grand jury by withholding evidence, such as the informants' criminal histories, that would call the witnesses' veracity into doubt, as well as by withholding all of the remaining exculpatory evidence.  His post-indictment conduct continued along the same lines.

149.    On May 22, 2012, the date the indictment issued but prior to plaintiff's arrest and arraignment, Holmes filed the KCDA's Notice of Readiness for Trial.

150.    In June 2012, plaintiff was arraigned on the indictment, at which time Holmes served notice of the prior identifications of plaintiff, noting specifically that the only identifications had occurred in February and April 2012. The notice did not identify the two witnesses, but they are believed to be P.S. and Informant 1, respectively.

151.    Holmes withheld any reference to the identification by Informant 1 in 2006 in the KCDA's notices and discovery production.

152.    Holmes also suggested that P.S., whom he refused to name, had positively identified plaintiff. This was, as Holmes knew, absolutely false. P.S. had already told investigators that he did not know plaintiff and did not recognize the photograph of plaintiff that investigators had shown him.

153.    Holmes's claim that such an identification had been made by an unidentified witness can best be understood as an attempt to coerce a guilty plea from plaintiff.

154.    Holmes further withheld the identity of, and details of the roles played by Informants 1 and 2, as well as any information related to these individuals, even after

defendants' subsequent discovery production.

155.   By withholding their identities, Holmes kept their criminal records, status as paid informants, and diverse history of conduct that would not only call their truthfulness into question, but, on a far more basic level, undermine the integrity of the decision to initiate the prosecution and the manner in which it was conducted.

156.   Meanwhile, Holmes continued to perpetuate Informant 1's fabricated claim that there had been a confrontation between plaintiff and Fernandez that gave rise to the arson/murders. For instance, in July 2013, Holmes, who had since been promoted to "Executive District Attorney," stated in a letter sent to the trial court that plaintiff's relationship with Fernandez "was torn asunder with the defendant's explosive outburst and trenchant reaction to a bad batch of heroin sold by Fernandez to the defendant. He angrily demanded the return of his money, or preferably, a superior bag of heroin."

157.   At no time did Holmes ever indicate, be it to plaintiff's counsel, the court, or anyone else, that this fantastic claim had gone unmentioned by Informant 1 during his multiple conversations with investigators and the KCDA over the five years prior to his appearance before the grand jury.

158.   Similarly, Holmes further continued to point to other questionable evidence, such as his claim that plaintiff had confessed to Informant 2 that he had "miscalculated by breaking in at night, and murdered four innocent people." Holmes again chose not to advise the court or defense counsel that Informant 2 had actually reported that plaintiff said the crime happened during the day.

29

159.   In or about May 2013, the case was transferred to the Hon. Guy J. Mangano, Jr., for pretrial hearings and trial.

160.   At or about that time the plaintiff asked to have new counsel appointed, following which he was assigned Amy Rameau, Esq.

161.   The transfer to Justice Mangano was to be followed shortly thereafter by the commencement of the hearings and trial, but these were delayed briefly to allow incoming counsel time to familiarize herself with the file and prepare accordingly.

162.   Ms. Rameau began reviewing the file and discovered that large amounts of critical materials and information had not been produced. This led to further motion practice and more demands for discovery, and the pending hearings and trial, were necessarily delayed.

163.   Among the many items plaintiff sought were the names of Informants 1 and 2, and discovery concerning their relationships with the NYPD and KCDA, their criminal histories, and other information necessary to prepare for a quadruple homicide trial in which Informants 1 and 2 were the KCDA's most critical witnesses.

164.   Eventually, Holmes was forced to identify Informant 1 by name,  but he continued to withhold documentation and information relating to his record and his past communications with the NYPD and KCDA. For instance, as late as March 2014, Holmes had continued to stonewall demands for notes and records concerning the meetings between Informant 1 and the NYPD and KCDA, as well as the Confidential Informant file maintained by the NYPD for Informant 1.  Holmes further withheld the audio recording of

the August 2006 interview of Informant 1 by the KCDA and the attending ADA's notes.

165.    Although there were claims that the NYPD had assembled photographs and, beginning in 2006,  displayed these to various witnesses such as Informant 1 and P.S., none of these photographs, nor any records concerning the use of the photo arrays, or any of the accompanying documentation, had been produced. Holmes had, in fact, sought to obscure their existence at the outset of the prosecution by limiting the past identifications of plaintiff to two events in 2012, as well as in his discovery responses to plaintiff's original defense counsel.

166.    Meanwhile Holmes and the KCDA denied that there was any agreement, formal or informal between the KCDA and Informant 2 and continued to refuse to identify him or provide any information about him, other than to confirm he was a jail house informer.

167.    When asked by plaintiff's counsel to provide "Any statements or documents, including but not limited to grand jury testimony . . . made or executed by any potential prosecution witness at the trial of this action which the prosecution knows, or through reasonable diligence, should have reason to know is false," Holmes answered "None known at this time."  Holmes knew this statement to be false, as he had deliberately solicited a variety of false and deceptive statements from witnesses in the grand jury.

168.    Holmes similarly produced some, but not all, information concerning the other fires in the vicinity, despite plaintiff's repeated demands and their obvious relevance.

169.    Holmes also eventually acknowledged that there had been photo arrays and related documentation assembled in 2006 but that these materials could not be found or otherwise produced. Similarly, he claimed that the NYPD's notes and records from 2006 and 2007 interviews with the plaintiff were also lost.

170.    Eventually the KCDA was forced by the court to identify Informant 2, and to provide certain outstanding materials. This information led plaintiff's counsel to issue subpoenas for further documents and materials concerning the KCDA's two star witnesses and the suspicious fires that had been plaguing the neighborhood where 1033 Pacific Street was located during 2005 and early 2006.

171.    In or about April 2014, plaintiff's criminal counsel moved to dismiss all of the charges against plaintiff.

172.    Holmes and the KCDA opposed this motion.

173.    However, in May 2014, Holmes and the KCDA moved to dismiss all charges, and the case against plaintiff was subsequently terminated in plaintiff's favor.

174.    At no time during the course of plaintiff's prosecution did Holmes or the KCDA come to learn of any exculpatory facts or evidence that were not known to Holmes and the KCDA when they first decided to pin these murders on plaintiff.

175.    In fact, the only meaningful change that occurred between Holmes's decision to initiate plaintiff's prosecution, and his subsequent decision to dismiss the case, was that plaintiff and his counsel had also learned of these exculpatory facts and evidence.

176.    Upon information and belief, neither John Holmes, nor any other

member of the KCDA was ever disciplined in any fashion for the initiation and handling of the prosecution of Samuel Martinez.

177.     As of the date of this pleading, the person or persons who set the fire inside 1033 Pacific Street on February 24, 2006, and caused the tragic deaths of four innocent people, remain unidentified and at large.

## FIRST CAUSE OF ACTION

(42 USC §1983 Claims for Malicious Prosecution and
Denial of Fair Trial as to individual defendants Holmes and O'Dwyer)

178.     Plaintiff repeats and realleges each and every preceding allegation contained herein.

179.     During the course of the investigation into the fire at 1033 Pacific Street prior to the commencement of criminal process against plaintiff, individual defendants O'Dwyer and Holmes decided to prosecute plaintiff for the arson and murders.

180.     The individual defendants made this decision despite the absence of probable cause for plaintiff's prosecution.

181.     The individual defendants then embarked on a deliberate and willful course of conduct designed to create, by hook or by crook, evidence to support the anticipated prosecution, while burying or otherwise ignoring any evidence that tended to exculpate plaintiff or contradict or undermine the witnesses and evidence upon which the defendants intended to rely.

182.     Notwithstanding the lack of probable cause to proceed, the defendants

33

elected to initiate plaintiff's prosecution and, in late April 2012, began presenting testimony to a grand jury with the intention of obtaining plaintiff's indictment.

183.    Throughout the course of the events leading up to the presentation of evidence to the grand jury, the individual defendants knew and understood that the evidence they were seeking to manufacture would later be used to commence and justify plaintiff's prosecution, with the intention of ultimately bringing about his conviction for a quadruple homicide.

184.    At all relevant times leading to the presentation of the case to the grand jury in April 2012, Holmes was carrying out investigatory duties within the scope of his employment as an ADA employed by the KCDA.

185.    At all relevant times beginning with his initial involvement in the investigation through the final dismissal of all criminal charges against plaintiff, O'Dwyer was acting within the scope of his employment by the NYPD.

186.    In May 2012, Holmes, deliberately and knowingly relying on falsified information that was assembled with the knowing assistance and cooperation of O'Dwyer, procured plaintiff's indictment.

187.    In so doing, defendants O'Dwyer and Holmes knowingly and willfully manufactured, solicited, caused the manufacturing of, or otherwise knowingly encouraged the manufacturing of false statements by Informants 1 and 2, with the expectation, indeed the desire, that these false statements would be presented to a grand jury to gain plaintiff's indictment and justify the continuation of his criminal prosecution.

34

188.     Holmes lied to the grand jury, or otherwise knowingly utilized testimony that he understood to be materially false or outright perjury.

189.     Holmes further misled the grand jury by withholding any evidence, no matter how probative or relevant, that might prevent him from obtaining an indictment, such as evidence that Informants 1 and 2 were informants, and not disinterested witnesses, as well as evidence of their lengthy histories of criminal conduct, including Informant 1's many crimes of dishonesty, and Informant 2's prior delusional behavior.  Holmes also ensured that the grand jury was unaware the 1033 Pacific Street fire was but one of many such suspicious fires in that neighborhood at that time. In addition, Holmes did not tell the grand jury that P.S. had denied knowing plaintiff and otherwise undermined Informant 1's testimony about the purported conversation involving P.S. and "Jose."

190.     Holmes's malicious prosecution of plaintiff continued unabated following the indictment as Holmes continued to embrace and repeat the lies and misstatements he had manufactured, or which he understood were fabricated by his witnesses, and did so to both the court and plaintiff in order to sustain and continue the prosecution, all of which was undertaken with the sole goal of coercing a guilty plea from Samuel Martinez, or pitching the same fictitious story to a jury in order to secure a guilty verdict.

191.     Holmes fought to withhold any information concerning the identities and histories of Informants 1 and 2, while simultaneously hiding all of the same evidence that had been withheld from the grand jury.

35

192.    Even after Informant 1's name was finally revealed, Holmes continued to refuse to turn over information concerning his background or the lies he told, and which Holmes knew to be lies, that would undermine his credibility or, more importantly, further undermine the integrity of the investigation and prosecution.

193.    Meanwhile, Holmes desperately fought to keep Informant 2's identity hidden altogether, until finally, in the early part of 2014, the court ordered him to disclose the informant's name and certain related materials.

194.    It was at about this time that Holmes's carefully constructed case finally fell apart. Plaintiff's new counsel uncovered an array of damning information about the Informants, which was precisely what Holmes had attempted to hide, as well as various exculpatory evidence regarding the assorted neighborhood arsons. Moreover, it became increasingly apparent that Holmes, acting on behalf of Vecchione and the KCDA, had engaged in a pattern of deceptive conduct throughout the investigation and prosecution.

195.    The KCDA eventually had no choice but to seek the dismissal of all charges against the plaintiff, and the case they had maliciously and wrongly commenced was finally terminated in plaintiff's favor.

196.    By so doing, the individual defendants Holmes and O'Dwyer, individually and collectively, caused the plaintiff to be subjected to malicious prosecution, and the deprivation of plaintiff's right to due process and to a fair trial through the use of fabricated evidence, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

197.    By reason thereof, the individual defendants Holmes and O'Dwyer have violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## SECOND CAUSE OF ACTION

(1983 Monell Claims Arising from KCDA Conduct)

198.    Plaintiff repeats and re-alleges each and every preceding allegation contained herein.

199.    The foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct chargeable to the defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities by the KCDA.

200.    At all relevant times herein, the office of the KCDA was a City agency under the direction of then-District Attorney Charles Hynes, who was executive officer and chief administrator of the KCDA.

201.    At all relevant times herein, the KCDA maintained a policy, custom and/or practice of encouraging, either affirmatively or through repeated acts of willful blindness, violations by KCDA prosecutors of the constitutional rights of individuals who were the subject of criminal investigations or prosecutions by the KCDA; and by either affirmatively endorsing said conduct or otherwise permitting said conduct to continue on

notice thereof without any meaningful efforts to curb such conduct, the KCDA endorsed, ratified, or otherwise approved and permitted said policy to not only exist but to grow and flourish.

202.    While such conduct also occurred prior to 1990, this policy began or was subsequently adopted or ratified, formally or informally, or otherwise crystalized following Hynes's induction as KCDA in 1990, and continued throughout the entirety of his 24-year tenure.

203.    In January 2014, having defeated Hynes in the 2013 election, Kenneth Thompson was sworn in as the Kings County District Attorney, becoming the first person to hold that position since Hynes had assumed office in January 1990.

204.    Shortly after his inauguration, Thompson revamped the KCDA's Conviction Review Unit, which began evaluating convictions obtained by prior KCDA administrations, and resulted in 19 exonerations in just the past two years.

205.    The KCDA under Hynes was sullied by a deep-seated pattern of police and prosecutorial misconduct, amounting to a municipal policy of conscious disregard and deliberate indifference to the constitutional and civil rights of individuals suspected or accused of criminal activity, as well as to the risk that innocent people will be arrested, prosecuted, and possibly convicted and imprisoned, and to the right of all criminal suspects and defendants to due process and a fair trial.

206.    This policy permitted, encouraged, or acquiesced in the violation of the constitutional rights of individuals by prosecutors, detective-investigators, and NYPD

detectives, particularly in high-profile or serious cases where arrests and convictions are most desired by the KCDA. The policy led directly to the violations of plaintiff's constitutional rights prior to and throughout his criminal prosecution.

207.    More specifically, under Hynes, the KCDA elevated the importance of successfully initiating prosecutions and obtaining convictions, particularly in said high-profile or serious matters, over the KCDA's constitutional and statutory obligations to both the defendants and the courts, to say nothing of the People of the State of New York and the state and federal constitutions Hynes and ADAs had sworn to uphold.

208.    The KCDA's policy was to encourage, whether explicitly or tacitly, conduct prior to and during prosecutions that, however constitutionally infirm, would bring about convictions, and in so doing, endorsed certain types of conduct that the KCDA and its attorneys knew would, at a minimum, violate the constitutional rights of the persons they were seeking to convict.

209.    Such conduct included knowingly employing fabricated testimony or evidence to initiate and sustain prosecutions and withholding evidence of the fabrication or falsity of the testimony or evidence.

210.    Such conduct included, but was not limited to, obtaining indictments by presenting materially false and misleading evidence to grand juries with the intention of securing indictments, even when the KCDA knew that it lacked probable cause to prosecute the persons whose indictments were being sought.

211.    Such conduct included, but was not limited to, tolerating the

fabrication of evidence by members of the NYPD, utilizing such evidence, and covering up the NYPD's use of such evidence.

212.    Such conduct included, but was not limited to, proceeding with prosecutions based on evidence supplied by civilian witnesses through the NYPD which the KCDA knew was manufactured or otherwise utilizing materially unreliable, incomplete, inaccurate, or otherwise infirm evidence, while covering up such misconduct by these witnesses and officers.

213.    Such conduct included, but was not limited to, covering up such misconduct but withholding other exculpatory evidence, materials, and information, including material that is required to be disclosed under federal and/or state law, including what is commonly known as Brady material, resulting in the extended deprivation of liberty for the criminal defendant.

214.    Such conduct included, but was not limited to, continuing with prosecutions in the face of the KCDA's knowledge or awareness that the prosecution could not otherwise be reasonably sustained by withholding any evidence that would be damaging to the likelihood of obtaining a conviction.

215.    Such conduct included, but was not limited to, continuing to cover up such conduct, even when said conduct has caused individuals to be prosecuted, imprisoned, and, on occasion, convicted and further imprisoned, for crimes of which they were actually innocent.

216.    Such conduct constituted, but was not limited to, malicious prosecution

and the abuse of process, the denial of substantive due process and the violation of the right to a fair trial, unlawful seizure and imprisonment, denial of access to the courts, and other such constitutional violations.

217.    In its totality, the KCDA's policy at issue is one in which its attorneys were instructed, encouraged, or otherwise informed that such misconduct, i.e., utilizing fabricated evidence, withholding exculpatory evidence, lying to judges, counsel, grand juries, and juries, and engaging in similar misconduct was a viable option available to ADAs if they deemed it necessary to initiate or sustain a prosecution, bring about a conviction, or defend a conviction after the fact, and this was particularly prevalent in high-profile or serious cases.

218.    Put most simply, the KCDA valued the procurement of convictions in certain cases more highly than it did compliance with ethical and constitutional obligations, even when the KCDA knew or should have known that the target of their investigation or prosecution was actually innocent. As a a result, certain of its prosecutors, including John Holmes, freely and willfully engaged in unconstitutional conduct in order to obtain indictments and convictions without regard to their legal obligations, the constitution, or their overarching duty to do justice.

219.    While prosecutors were presumably told that they were, in theory, to comply with the federal and state constitutions, as well as their statutory obligations, there was no threat of adverse consequences if they failed to do so, and in fact, no such punishment ever occurred. The absence of any disciplinary consequences, even where the misconduct was publicly established, clearly communicated to KCDA prosecutors that any

41

perceived constitutional obligations or any notion that they had an overarching duty to do justice existed in name only.

220.    The KCDA was aware that its failure to turn over exculpatory material, and other types of misconduct as described herein, would make it easier to coerce guilty pleas from criminal defendants, regardless of their actual guilt, and that even if cases were to proceed to trial, such misconduct would often go undetected. Moreover, even if the exculpatory evidence were later found, the defendant would still have to prove that the violation was more than harmless error, which further incentivized the KCDA to deliberately engage in such prosecutorial misconduct, and explained why Hynes continued to support his ADAs, no matter how stark the evidence of misconduct.

221.    The City of New York was on notice that the KCDA was engaging in, or otherwise tolerating, a variety of unconstitutional actions that were causing serious and permanent injuries to the individuals who were wrongly prosecuted, and often wrongly convicted and imprisoned, as well as the residents of the City of New York who relied on the municipality and the KCDA to enforce the law and uphold the constitution.

222.    Although such notice was provided time and again, neither the City of New York nor the KCDA took any action to acknowledge, remedy, or rectify the conduct that led to the injuries, and thereby ratified this past conduct and authorized its continuation.

223.    The municipal defendant was on notice that, in case after case, courts had found that KCDA prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under Brady or black-

letter discovery procedures, or otherwise had engaged in conduct that misled courts, juries, and/or criminal defendants, and yet none of the prosecutors involved were disciplined. None of these prosecutors were fired, suspended, fined, or demoted. No adverse action was taken against them by the KCDA nor were they reported to any external disciplinary bodies.

224. One victim of the KCDA was Jabbar Collins, whose battle to overturn his 1994 murder conviction, and subsequent civil rights lawsuit, pulled back the curtain on the pervasive misconduct that infested far too many KCDA prosecutions. In 2010, after 16 years imprisonment, the Hon. Dora L. Irizarry granted Collins's application for a writ of habeas corpus, finding the KCDA's conduct "shameful" and "a tragedy." Hynes was unrepentant and publicly supported Collins's chief prosecutor, Michael Vecchione.

225. Collins filed suit in this district in 2011, under docket 11 CV 766 (FB) (RML), asserting various civil rights claims against the City and various individual defendants. As the Hon. Frederick Block noted in one ruling, "despite scores of cases involving Brady violations and other prosecutorial misconduct, [the Kings County District Attorney] has never disciplined an assistant for such misconduct, even after the violations were confirmed by court decisions." *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013). Upon information and belief, the City eventually settled the case for $10,000,000.

226. In his complaint, Jabbar Collins detailed dozens of cases and instances over a period of many years evincing Hynes's willingness to overlook constitutional violations and other prosecutorial misconduct when it resulted in convictions. Those references are incorporated by reference herein, as are the delineated acts of misconduct by

43

ADA Vecchione to which Hynes responded with public support. Moreover, as Collins's complaint articulates, despite ample evidence of Vecchione's practice of ignoring his constitutional obligations and otherwise engaging in or abetting prosecutorial misconduct, Hynes continued to promote Vecchione within the KCDA, thereby signaling his endorsement of such misconduct, and further reinforcing Hynes's preexisting policy.

227.    That Michael Vecchione, who had been assigned to a series of senior positions in the KCDA under Hynes, including head of the Homicide Bureau in the mid-1990s, and later, at all relevant times herein, as the Chief of the Rackets Division, within which Holmes was working during his investigation into the 1033 Pacific Street arson/murders and the indictment of plaintiff, had engaged in serious and shameful misconduct in the Collins case was not breaking news when Judge Irizarry issued her ruling in 2010.

228.    In an article published on March 16, 2006, less than a month after the tragic deaths at 1033 Pacific Street and six years before plaintiff's indictment, the New York Times detailed evidence supporting Collins's claims that Vecchione had coerced testimony from two witnesses by promising both benefits and reprisals, and then blatantly lied in court to cover up the KCDA's conduct, meaning the offers and threats. One such example described how Vecchione stated in his closing argument that any idea that a witness had testified pursuant to a deal with the KCDA was "absurd" and "laughable." Collins later uncovered notes from that witness's attorneys establishing that the witness's testimony had been given in exchange for leniency in another felony prosecution.

44

229.    The case, which was filed prior to the plaintiff's indictment, was not an

anomaly, as illustrated by the following cases, which are far from exhaustive and offered

merely as examples:

a.   David Ranta was convicted in 1990 for a murder he did not
commit, based on fraudulent and trumped up evidence
assembled by notorious retired NYPD Detective Louis
Scarcella. The KCDA defended the conviction for years, until
the evidence of Ranta's innocence was too overwhelming to be
denied. He was exonerated in 2013, and shortly thereafter the
City of New York paid him $6.4 to head off his anticipated
lawsuit. Scarcella, as it turned out, had used the same eyewitness
in several different murder cases prosecuted through the same
KCDA office, and that at least six confessions had included
similar phraseology: "You got it right. I was there;"

b.   In July 1990, Jonathan Fleming was wrongfully convicted and
imprisoned for almost 25 years, in part, on the basis of
fabricated eyewitness testimony whose falsity was known to the
KCDA but was never disclosed to the defense. Hynes's
successor was instrumental in his release and, in 2015, the City
of New York then paid Fleming $6.2 million prior to the
commencement of a legal action;

c.   In 1991 Andre Hatchett was wrongfully convicted for murder
and imprisoned until March 2016, when the KCDA determined
that his conviction resulted from "systemic failure," and was
"marred by Brady violations." The KCDA had failed to disclose
to the defense that its only eyewitness against Hatchett was a
career criminal, that he had originally identified another man as
the killer, and that he was smoking crack on the day of the
murder he claimed to have witnessed;

d.   The 1993 murder conviction of Ruddy Quezada was vacated in
August 2015 when it was discovered that KCDA prosecutors
concealed exculpatory information from him in post-conviction
proceedings years earlier;

e.   Roger Logan was arrested, convicted and sentenced to 25 years
to life in prison for a 1997 murder that he did not commit based

largely on eyewitness testimony from one person. It took him 17 years to overturn the conviction, which, like many of the Hynes-era convictions, did not occur until after Kenneth Thompson's election. His exoneration followed the disclosure that the KCDA eyewitness was in police custody on the day of the murder and hence did not witness the murder as claimed. In January 2016, the City settled Logan's wrongful conviction claim prior to the filing of a lawsuit for $3.75 million;

f.  In 2011 Ronald Bozeman was arrested for a robbery, and prosecuted thereafter, despite the KCDA's knowledge that the witnesses against him had recanted and identified another person as the perpetrator. Bozeman claimed that KCDA attorneys coached witnesses to circumvent the truth and sued the City of New York, and others in this Court under docket 13 CV 3468 (SLT) (VMS), which reportedly settled for $150,000;

g.  In 1992, the KCDA obtained the convictions of Antonio Yarbough and Sharrif Wilson for three murders. Their convictions were vacated in February 2014 after DNA evidence exonerated them and corroborated Yarbough's repeated claims of innocence and profound police misconduct;

h.  William Lopez was convicted of murder in 1990 and imprisoned for more than two decades until, in 2013, the Hon. Nicholas G. Garaufis, found compelling evidence of actual innocence and ordered Lopez's immediate release from custody and the vacatur of his indictment. The KCDA vigorously opposed this ruling, despite the Court's observation that the prosecution of Lopez was "rotten from day one." *Lopez v. Miller*, 915 F. Supp. 2d 373 (E.D.N.Y. 2013);

i.  Antowine Butts was arrested in 1998 and prosecuted for a double homicide of which he was ultimately acquitted, but only after spending two years in custody. Butts alleged misconduct on the part of both the NYPD and KCDA in a suit docketed in this Court as 01 CV 2945 (BMC) (RML), and which settled for $220,000;

j.  In May 2014, the 1988 murder convictions of Darryl Austin, Alveana Jenette, and Robert Hill were vacated in light of exculpatory evidence that had been withheld from the

46

defendants. The prosecutions were driven by the work of infamous retired NYPD Detective Louis Scarcella, whose attorneys stated that the KCDA's homicide unit had continuously vetted Scarcella's information; and,

k.     Clarence Bailey was convicted in 2009 for attempted murder and imprisoned until the conviction was overturned in 2013. He subsequently sued, alleging various acts of deliberate misconduct by members of the NYPD and KCDA, including the deliberate withholding of Brady material pursuant to office policy, in an action docketed in this Court as 14 CV 2091 (JBW) (VMS).  The Hon. Jack B. Weinstein denied the City's motion for summary judgment on Bailey's Monell claim concerning the KCDA's policies concerning, in part, Brady disclosures. *Bailey v. City of New York*, 79 F. Supp. 3d 424 (E.D.N.Y. 2015). The action has recently settled for an undisclosed amount.

230.    These cases and reports are but a small sample of the publicly known information that expressly identified the KCDA's ongoing pattern and practice of subordinating its constitutional and statutory obligations to its desire to initiate prosecutions and obtain convictions. This policy was most often practiced in high-profile or serious cases, or cases where there were more acute political pressures and public relations considerations.

231.    Moreover, even if there were no such overt or affirmative policy, the municipal defendant was aware of the prevalence of such prosecutorial misconduct in the KCDA and was continuously and deliberately indifferent to the risk that the KCDA's tolerance and acceptance of such conduct – which included, but was not limited to: (1) the knowing fabrication and use of fabricated evidence as well as (2) the withholding of exculpatory evidence for the purpose of causing and perpetuating an innocent person's confinement and imprisonment – would result in further violations of the constitutional rights of people investigated or prosecuted by the KCDA generally, as it did to the rights of

47

the plaintiff in particular.

232.    The steady stream of wrongful convictions and malicious prosecutions that began surfacing in the latter half of Hyne's tenure, along with the corresponding avalanche of articles and reports and resulting civil lawsuits, merely confirmed what the municipal defendant knew all along: the KCDA's willingness to ignore or violate the constitution when its strictures would impede the ability to indict and convict was not the rare product of rogue ADAs, but rather an accepted practice within the office, as reflected by the volume of violations, the KCDA's continued defense of the ADAs, including Vecchione, and the absence of any training or remedial programs, or other actions by the KCDA designed to curb such conduct or remedy and halt such improper practices. In short, there was ample evidence of prosecutorial misconduct over a period of many years and no evidence that the KCDA ever sought to prevent it from occurring or punished anyone for engaging in it.

233.    Broadly speaking, the City, as a matter of policy, does not, and certainly did not during the relevant time period, discipline its prosecutors for the various types of misconduct committed within the KCDA, which included the knowing use of false or fabricated evidence, prosecution of the innocent, lying to and misleading juries and judges, and soliciting or otherwise coercing or encouraging the giving of false testimony, and other such prosecutorial misconduct.

234.    Upon information and belief, Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or

potential sanctions therefor, notwithstanding his ADAs' proven affinity for such misconduct.

235. In short, the KCDA under Charles Hynes, either directly or tacitly encouraged, authorized, and otherwise knowingly permitted, the KCDA attorneys to ignore their obligations under the law in order to ensure that indictments issued and convictions followed, particularly in high-profile or serious matters, and in so doing fostered and maintained a culture where ADAs such as Holmes were comfortable engaging in the fabrication of evidence, the use of such evidence, the withholding of exculpatory evidence, and other misconduct, with, at the very least, a deliberate indifference to the risk that such polices would cause those individuals whom they investigated or prosecuted to be subject to malicious prosecution, false imprisonment, the denial of their right to due process and a fair trial, and other such violations of the federal constitution.

236. Hence, the aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the municipal defendant, including, but not limited to, the District Attorney of Kings County and his delegates, who knew that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases, and understood that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives

that employees have to engage in misconduct, and that such poor decision-making or

misconduct by KCDA members and employees will frequently cause the deprivation of the

constitutional rights of criminal suspects and defendants.

   237. The municipal defendant, acting through the KCDA and its executive

officers, has final responsibility for training, instructing, supervising, and disciplining KCDA

personnel with respect to the investigation and prosecution of criminal matters, including the

constitutional requirements governing the interrogation of witnesses, the initiation of

criminal prosecutions, and the disclosure of all material evidence or information favorable to

a person suspected, accused or convicted of criminal conduct, including, but not limited to,

evidence of innocence, evidence that an identifying or prosecution witness is unreliable,

evidence that a prosecution witness has made inconsistent statements about material facts,

and evidence that a prosecution witnesses has a motive, bias or interest affecting his

credibility or has been pressured or coerced, so that the KCDA could comply with its

constitutional obligations.

   238. During all relevant times herein, the municipal defendant owed a duty

to the public generally, and to the plaintiff in particular, which the defendant knowingly and

intentionally breached, or to which it was deliberately indifferent, to implement policies,

procedures, customs, practices, training and discipline sufficient to prevent and deter

conduct by his subordinates violating the aforementioned constitutional rights of criminal

suspects or defendants and of other members of the public.

   239. The aforesaid policies, procedures, regulations, practices and/or

customs of the municipal defendant were, collectively and individually, a substantial factor in

bringing about the aforesaid constitutional violations by the individual defendants.

240.    By reason thereof, the municipal defendant has violated 42 U.S.C.

§1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish,

incarceration and the deprivation of liberty, and the loss of his constitutional rights.


### THIRD CAUSE OF ACTION

(1983 Monell Claims Arising from NYPD Conduct)

241.    Plaintiff repeats and realleges each and every preceding allegation

contained herein.

242.    The foregoing violations of plaintiff's federal constitutional rights and

injuries were directly, foreseeably, proximately, and substantially caused by conduct,

chargeable to the defendant City of New York, amounting to deliberate indifference to the

constitutional rights of persons, including plaintiff, who are investigated, arrested, or

prosecuted for alleged criminal activities.

243.    Prior to plaintiff's indictment for the February 2006 murders at 1033

Pacific Street, the City of New York had long exhibited a policy of deliberate indifference to

the NYPD's questionable and unconstitutional tactics in investigating crimes and securing

convictions therefor.

244.    With deliberate indifference to the constitutional rights of individuals

suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting

innocent people, and to the right of all criminal suspects and defendants to due process and a

fair trial, policymaking officials at the NYPD implemented plainly inadequate policies,

procedures, regulations, practices, customs, training, supervision, and discipline concerning,

in part: (a) the use of excessive promises of rewards and unduly coercive interrogation

techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers,

and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

(b) the continuing duty of police investigators to preserve and to make timely disclosure to

prosecutors during criminal investigations and prosecutions, of all material evidence or

information favorable to a person suspected, accused or convicted of criminal conduct,

including, but not limited to, evidence of innocence, evidence that an identifying or

prosecution witness is unreliable or lacks general credibility, evidence that a prosecution

witness has made inconsistent statements about material facts, and evidence that a

prosecution witnesses has a motive, bias or interest affecting his credibility or has been

pressured or coerced, so that the District Attorney could comply with his constitutional

obligation to disclose such information to the defense under Brady.

245.    The aforesaid deliberate or de facto policies, procedures, regulations,

practices and/or customs (including the failure to properly instruct, train, supervise and/or

discipline employees with regard to their constitutional obligations) were implemented or

tolerated by policymaking officials for the defendant City of New York, including but not

limited to, the NYPD Commissioner, who had actual or constructive knowledge that these

policies, procedures, regulations, practices and/or customs concern issues that regularly arise

in the investigation and prosecution of criminal cases, and understood that such issues often present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of misconduct or mishandling by NYPD members, as well as incentives that NYPD members have to engage in misconduct, and that such poor decision-making or misconduct by NYPD members will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants.

246.    The municipal defendant is thus aware and had been aware of the NYPD's proven record of police misconduct, and there is credible evidence as articulated in the previously referenced *Collins v. City of New York*, 11 CV 766 (FB) (RML), that such misconduct (i.e., the withholding of exculpatory evidence, etc.) was tolerated by the municipal defendant. Specifically, the Hon. Frederic Block observed that police misconduct was "sufficiently widespread to support an inference of deliberate indifference," and quoting the Mollen Commission Report, went on to describe "testimonial and documentary perjury" as "the most common form of police corruption facing the criminal justice system today."

247.    Similarly, several of the sample cases cited in the Second Cause of Action involve NYPD misconduct that was tolerated by the KCDA, including that of retired NYPD Det. Louis Scarcella, which in many ways exemplifies the egregious and gross misconduct by NYPD officers long known to, yet overlooked by the municipal defendant.

248.    Once touted as a star homicide detective, Scarcella's legacy has been

53

tarnished by accusations of misconduct, including coaching witnesses, phony and coerced confessions, in addition to using the same crack-addicted prostitute as a witness in several of his cases. No adverse action was ever taken by either the NYPD or the City of New York to punish or discipline Scarcella, nor, upon information and belief, was he reported to any external disciplinary body. In fact, as Scarcella's attorneys have said, the KCDA's own attorneys contemporaneously vetted and continuously approved of his work.

249.    The municipal defendant was put on notice by dozens upon dozens of cases in which state and federal courts had found that NYPD officers had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under Brady, Rosario, Giglio, or black-letter discovery procedures, or engaged in other types of misconduct such as fabrication of evidence, subornation of perjury, coercing false confessions, conducting unduly suggestive identification procedures, and intimidation of witnesses.

250.    These cases are but a small, small drop in the ocean of civil rights cases against members of the NYPD in which plaintiffs are claiming that they were falsely arrested and imprisoned or prosecuted based on fabricated evidence.

251.    More generally, according to an article in New York Magazine, dated October 10, 2014, the City of New York issued a report reflecting that it paid an average of $33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure did not take into account filed cases that were still pending when the report was compiled. Similarly, the City Comptroller has reported that the City of New York's payments to resolve

allegations of misconduct by members of the NYPD had risen from $99 million to $217

million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015

report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf.  These numbers

reflect the City's actual knowledge that its police department was routinely engaging in

unconstitutional and unlawful conduct.

      252.    In an Order dated November 25, 2009, in *Colon v. City of New York,*

09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as
> well as knowledge of cases in other federal and state courts, has
> revealed anecdotal evidence of repeated, widespread falsification by
> arresting police officers of the New York City Police Department.
> Despite numerous inquiries by commissions and strong reported
> efforts by the present administration -- through selection of candidates
> for the police force stressing academic and other qualifications, serious
> training to avoid constitutional violations, and strong disciplinary action
> within the department -- there is some evidence of an attitude among
> officers that is sufficiently widespread to constitute a custom or policy
> by the city approving illegal conduct of the kind now charged.

      253.    It is thus manifestly clear through the litigation brought in the Eastern

and Southern Districts of New York, as well as the many cases filed in New York's State

courts, that thousands of civilians have alleged that members of the NYPD have deliberately

arrested them without probable cause.  Thus, even if the municipal defendant was not the

architect of the policies and routinized conduct causing these unlawful arrests, it was

certainly on notice of the practice, and by failing to take any meaningful corrective steps, has

ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it

employs.

254.     Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders.

255.     The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City of New York and the NYPD's executive leaders and supervisory personnel.

256.     The municipal defendant, acting through the NYPD and its executive officers, has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including the constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of Brady material.

257.    During all material times herein, the municipal defendant owed a duty to the public generally, and to the plaintiff in particular, which the defendant knowingly and intentionally breached, or to which it was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline, sufficient to prevent or deter misconduct by its subordinates that would violate the aforementioned constitutional rights of criminal suspects and other members of the public.

258.    The aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the violation of plaintiff's constitutional rights by the individual defendants.

259.    By reason thereof, the municipal defendant has violated 42 U.S.C. § 1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, as well as the loss of his constitutional rights.

## FOURTH CAUSE OF ACTION

(Malicious Prosecution under State Law as to All Defendants)

260.    Plaintiff repeats and realleges each and every preceding allegation contained herein.

261.    By virtue of the foregoing, the individual defendants, including those employed by the KCDA and the NYPD, acting in concert with each other and with additional persons for  whose acts they are liable, initiated, caused to be initiated, continued, or caused the continuation of, criminal process against plaintiff.

262.     The criminal prosecution terminated in plaintiff's favor.

263.     There was no probable cause for the commencement or the continuation of the criminal prosecution, nor would it have been objectively reasonable for the individual defendants to have believed that sufficient legal cause for the prosecution existed.

264.     The defendants acted with actual malice.

265.     Defendant City of New York is liable for the acts of its agents and employees, including those employed by the KCDA, under the principle of respondeat superior.

266.     Accordingly, the defendants are liable to plaintiff for subjecting him to malicious prosecution and causing him to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

**[Remainder of Page Intentionally Blank]**

**WHEREFORE**, the plaintiff demands judgment against defendants jointly

and severally as follows:

      i.     on the first cause of action, actual and punitive damages in an amount to be determined at trial;

      ii.    on the second, third, and fourth causes of action, actual damages in an amount to be determined at trial;

      iii.   statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

      iv.   such other relief as the Court deems just and proper.

Dated:    New York, New York
          April 22, 2016

                   Respectfully submitted,

_____
Michael Lumer, Esq.
Lumer & Neville
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060

/s/
_____
Robert Marinelli, Esq.
Law Office of Robert Marinelli
305 Broadway, 9th Floor
New York, New York 10007
(212) 822-1427